A90A2100. DUPREE et al. v. KELLER INDUSTRIES, INC.
(404 SE2d 291)

BEASLEY, Judge.

Our consideration of this appeal focuses on the duty element of the tort of negligence.

Plaintiffs Dupree and Landry appeal summary judgment, which

was granted in an explanatory order, and entry of final judgment in favor of defendant Keller Industries, Inc. This action was brought by plaintiffs to recover for hand injuries they sustained in separate incidents while at work operating a hydraulic punch press. The press was once owned and then sold by Keller to plaintiffs' employer, Dixie Aluminum Products Company, Inc.

There were five defendants in addition to Keller: E. W. Bliss Co., Inc., manufacturer of the press, and Harding Erectors, Inc., Parker Industrial Maintenance, Inc., Lektrol, Inc., d/b/a Lektrol Automation Services, and Southside Industrial Maintenance, Inc., companies which had inspected and serviced the machine after Dixie bought it. Bliss was voluntarily dismissed without prejudice. The remaining defendants were dismissed with prejudice following settlement.

The primary theory of negligence was that Keller was under a duty to conform to industry standards and to regulations of the United States Occupational Safety & Health Administration (OSHA) with respect to the press, that Keller breached the duty by failing to incorporate into the press certain safeguards, namely "control reliability" and "brake monitoring circuitry," and that the failure to add the safeguards was the proximate cause of their injuries. An alternative theory was that Keller was liable because it failed to advise Dixie of the dangerous condition.

The trial court rejected plaintiffs' contention that the press was inherently dangerous, found persuasive Keller's argument that any duty imposed on it by industry and OSHA standards was assumed by Dixie at purchase of the press, and concluded that Keller was not responsible for the effects of extensive modifications to the press after it left Keller's control. The court also concluded that as to Keller there was a plain and palpable lack of proximate cause.

The two injured press operators claim that the trial court improperly weighed the evidence and decided issues of fact, such as whether or not the press as sold by Keller was unsafe because it lacked certain safeguards, whether or not Keller's selling the machine without the safeguards constituted negligence since Keller knew buyer Dixie would not make the machine safe for use, and whether or not Keller's negligence was the proximate cause of the injuries sustained.

The following was undisputed: Bliss manufactured and sold the press in 1953 to a division of General Motors. Keller purchased it about 1974 for use in manufacturing aluminum parts for storm doors. No injuries are known to have occurred while Keller used the punch press in its manufacturing operation.

Keller decided to discontinue manufacture of a component part for its storm doors. Dixie was doing different component parts for the same product line and wished to expand its business to manufacture

those parts needed by Keller. In February 1985, Keller sold the production line which included the press to Dixie. The two companies entered into an "Equipment Sale and Manufacturing Agreement" whereby Dixie agreed to purchase Keller's equipment including the press and to enter into a contract to supply Keller's door component requirements. The equipment was sold expressly "as is, where is."

At Dixie, the press functioned with a two-palm button operation. The operator would place with his hands a sheet of aluminum between the dies and then press the two palm buttons simultaneously. This would cause the press to cycle and stamp the metal. During the cycle, the ram holding the upper die came down rapidly and with great force. After the cycle, the operator would reach between the dies and remove the finished product. At Keller, two men had operated the machine. One fed the raw material in from one side and the other removed the product after it was stamped. Each man used two buttons.

Dixie hired Harding to move, erect, and place the machine in operation at Dixie. Harding's work included unloading the press, placing and anchoring it in the building, and running an electrical conduit to it. Getting the press operational was a problem so Dixie also hired Lektrol to assist. At the least, Lektrol disconnected one of the two sets of two-palm button operative controls, rewired portions of the press control panel to the press, reconnected or replaced wire in the control panel which had been severed in relocating the press to Dixie, adjusted the cam switches, prepared a rough wiring diagram, and replaced a pressure relief switch.

Dixie operated the press from the first half of 1985 until June 1986, when it hired Parker to repair a drive shaft and flywheel on the press. Parker subcontracted with Southside for repairs, including disassembly and reassembly of various portions of the press.

Dixie hired Dupree in early 1986 and assigned him to operate the press. Dupree had never worked for Keller. Dixie employees taught him how to operate the press, including how to put in and align metal and how to put his hands under the rams of the press. On July 22, 1986, Dupree's hands were severely injured when the press' upper operating ram failed to stop at completion of a cycle and dropped down, pinning his hands. Prior to his injury, Dupree was aware that the press had had slippage incidents, including one where it went into a closed or "die-down" position without operator intervention. Dupree told his supervisors at Dixie about the "die-down" incident. He also witnessed an additional such incident prior to his injury.

Following Dupree's injury, Dixie hired Parker again to determine the cause of the problem and make any necessary repair. Parker inspected and worked on the press, including its mechanical brake.

Dixie employee Landry, who likewise had never worked for Kel-

ler, was assigned to operate the press after Parker's work. He, too, was taught by Dixie employees. Landry knew that Dupree had been injured on the press by having his hands caught between the dies. Landry operated the machine such that his hands were also placed inside. Approximately two weeks after Dupree's injury, on August 7, the press again malfunctioned in the same manner and pinned Landry's right hand. Prior to his injury, Landry had witnessed at least ten instances of die or ram slippage during his operation of the press.

1. A cause of action for negligence requires " '(1) [a] legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.' *Lee Street Auto Sales v. Warren*, 102 Ga. App. 345 (1) (116 SE2d 243) (1960)." *Bradley Center v. Wessner*, 250 Ga. 199, 200 (296 SE2d 693) (1982). See also Prosser, Law of Torts, 4th ed., § 30 (1971), quoted in *Sutter v. Hutchings*, 254 Ga. 194, 196 (1) (327 SE2d 716) (1985).

Plaintiffs attempt to establish the first element of their claim, a duty owed by Keller, by citing certain regulations published by the United States Occupational Safety & Health Administration (OSHA), plus similar industry standards for mechanical power presses set forth by the American Natural Standard Institute (ANSI). They rely additionally on the affidavit and deposition testimony of their expert rendering his opinion of the duty imposed by the regulations and standards.

OSHA regulations are "admissible not merely as 'standards' of performance, but as evidence of legal duty, violation of which may give a cause of action under OCGA § 51-1-6." *Cardin v. Telfair Acres &c.*, 195 Ga. App. 449, 450 (2) (393 SE2d 731) (1990). But applicability in a particular case, and relevancy, depend on the relationship of the parties.

OCGA § 51-1-6 provides for recovery of damages upon breach of a legal duty and specifies that the requirement under the law to perform or refrain from doing an act must be for the benefit of the injured person. "One of the problems arising out of the question of duty is the parties' status and their relation to each other." *Housing Auth. of Atlanta v. Famble*, 170 Ga. App. 509, 512 (317 SE2d 853) (1984). Does the defendant owe the duty to this plaintiff? If a defendant owes no legal duty to the plaintiff, there is no cause of action in negligence. *Washington v. Combustion Engineering*, 159 Ga. App. 555, 557 (284 SE2d 61) (1981). " '(W)hat duty a defendant owed a plaintiff is . . . a policy problem — a matter of law.' [Cit.]" *Honda Motor Co., Ltd. v. Kimbrel*, 189 Ga. App. 414, 417 (2) (376 SE2d 379) (1988).

The clear language of both the cited ANSI standards and OSHA regulations place the obligation to use the subject safeguards, i.e., control system and brake monitor, upon the employer. See ANSI § 5.5 and 29 CFR § 1910.217 (c) (5). OSHA regulates obligations between an employer and its employees. See 29 USC § 651 et seq.; *Barrera v. E. I. Du Pont De Nemours & Co.*, 653 F2d 915 (5th Cir. 1981); *Horn v. C. L. Osborn Contracting Co.*, 591 F2d 318 (5th Cir. 1979). Such is contemplated, as OSHA is not to "be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment." 29 USC § 653 (b) (4).

Since plaintiffs were not Keller's employees and thus were not persons who were intended to be benefitted by OSHA, any violation by it of the OSHA regulations would not be negligence per se in this case, as a matter of law. OCGA § 51-1-6. See *Sims v. Hoff*, 106 Ga. App. 626, 628 (1) (a) (127 SE2d 679) (1962); *Cardin*, supra at 450 (2); *Atlanta & West Point R. Co. v. Underwood*, 218 Ga. 193 (1) (126 SE2d 785) (1962).

Plaintiffs also contend that non-conformity with the OSHA regulations and ANSI standards were evidence of Keller's common-law duty to them. They rely on the opinion of their expert that Keller was obligated by the standards in the industry and regulations to have added the safeguards and that it failed to comply. It is true that ANSI standards, as privately established guidelines, are admissible as illustrative of negligence. See *Luckie v. Piggly-Wiggly &c.*, 173 Ga. App. 177, 178 (1) (325 SE2d 844) (1984). As to the admissibility of the OSHA regulations in this regard, see *Gilbert v. CSX Transp.*, 197 Ga. App. 29, 30 (1) (397 SE2d 447) (1990). However, neither the ANSI standards nor the OSHA regulations themselves raise a common-law duty to remote users. It must exist elsewhere, and for that inquiry we turn to Division 2 which explores the other aspect of plaintiffs' theory.

2. Appellants assert that a common-law duty flowed from Keller based upon the adoption of §§ 388 and 389 of the Restatement of the Law of Torts, Second, in *Moody v. Martin Motor Co.*, 76 Ga. App. 456 (46 SE2d 197) (1948).

Appellants cite, as the foundation of a duty owed by Keller to them, language in *Bradley*, supra, that the legal duty in that case arose "out of the general duty one owes to all the world not to subject them to an unreasonable risk of harm." However, the Supreme Court clarified this statement by explaining: "This has been expressed as follows: '. . . negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk

of harm.' Restatement, Torts, 2d, § 282." Id. at 201. Appellants cannot point to any standard established by law with regard to them, which Keller violated. Cf. *Bradley*, supra, where the Wessners did show such, with regard to a duty owed to the victim, their mother.

Appellants' reliance on *Moody* for the proposition that Keller was liable as supplier of a dangerous chattel is misplaced. That case involved injury from an independent contractor's alleged failure to repair a vehicle. The opinion quotes with approval the cited sections from the Restatement, Second, quoting § 388, which deals with failure to warn of dangerous chattel: " 'One who supplies directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied; (b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so. . . .' " *Moody*, supra at 459.[1]

It also invokes Section 389, which was likewise adopted in *Moody*: " 'One who supplies directly or through a third person a chattel for another's use knowing that the chattel is unlikely to be made reasonably safe before being put to a use which the supplier should expect it to be put, is subject to liability for bodily harm caused by such use to those whom the supplier should expect to use the chattel or to be in the vicinity of its probable use and who are ignorant of the dangerous character of the chattel or whose knowledge thereof does not make them contributorily negligent, although the supplier has informed the other for whose use the chattel is supplied of its dangerous character.' " *Moody*, supra at 461. The undisputed evidence was that there were no injuries to those operating the press during Keller's ownership and use. Even if the industry and federal regulations evidenced an inherent danger and Keller knew or should have realized that the press was or was likely to be dangerous for the use for which it was supplied, there was a complete absence of evidence that Keller had reason to believe that Dixie or its employees would not realize the lack of the safeguard devices. In fact, the evidence of others' inspection and work on the press after delivery to Dixie, along with the slippage incidents prior to plaintiffs' injuries, point to the

---

[1] For other Georgia cases discussing section 388, see *Hawkins v. Richardson-Merrell*, 147 Ga. App. 481, 483 (1) (249 SE2d 286) (1978); *Greenway v. Peabody Intl. Corp.*, 163 Ga. App. 698, 702 (2) (294 SE2d 541) (1982).

opposite conclusion, that Dixie and plaintiffs would have known or should have known of the lack of the safety devices on the press.

Plaintiffs' failure to show any legal duty imposed on Keller towards them is fatal to their claim of negligence. Judgment in favor of Keller was required as a matter of law.

3. The foregoing makes it unnecessary to address the remaining issues of intervening modifiers and proximate cause.

*Judgment affirmed. Pope and Andrews, JJ., concur.*

DECIDED FEBRUARY 28, 1991 —
REHEARING DENIED MARCH 13, 1991 — ▆▆▆▆▆▆▆

*Hodges, Erwin, Hedrick & Kraselsky, William A. Erwin, William H. Hedrick,* for appellants.

*Lokey & Bowden, Samuel P. Pierce, Jr.,* for appellee.