A98A1753. CHICAGO HARDWARE & FIXTURE COMPANY
v. LETTERMAN et al.
(510 SE2d 875)

BEASLEY, Presiding Judge.

Ronald Letterman was standing on an Amacker Timb-R-Lock tree stand when a portion of it broke. He fell and sustained injuries. He and his wife sued Amacker International, Inc., the manufacturer, seeking actual and punitive damages for personal injuries and loss of consortium on theories of strict products liability, negligence, and

---

[1] For Presiding Judge A. W. Birdsong, deceased.

breach of warranty.

Chicago Hardware & Fixture Company was added as a defendant based on allegations that failure of the tree stand was caused by the unfitness of a component, a turnbuckle, sold to Amacker by Chicago. Chicago moved for summary judgment as to the entire case or partial summary judgment as to plaintiffs' claim for punitive damages. Chicago sought complete summary adjudication because plaintiffs lost the component turnbuckle after this complaint was filed but before Chicago was added as a defendant. The trial court denied the motion without written explanation after remarking at the hearing that loss of the turnbuckle did not result from any intentional wrongdoing by plaintiffs. Chicago's application for interlocutory appeal was granted.

A turnbuckle is a mechanical device used to shorten or expand the length of the product or system into which it is incorporated. Essentially, it consists of eyebolts threaded into each end of an elongated buckle. When the buckle is turned in one direction, the bolts are drawn together and shorten the system; when turned in the opposite direction, the bolts are pushed apart and lengthen the system.

The turnbuckle in this case was used to adjust the length of a chain that secured the stand to a tree. The stand was installed by embedding sharp pegs into the trunk of the tree at the bottom of the stand, then looping the chain around the trunk at the top of the stand and tightening it with the turnbuckle.

Letterman bought the tree stand as new about three years before his fall and had not had it repaired or modified. He used it to stand on while hunting about 20 times, attached it to a tree about 15 times, and kept it outside intermittently. He testified that immediately after he installed the tree stand on the day he fell, the turnbuckle split at the seam, allowing an eyebolt to pull out of its thread so that the stand separated and collapsed.

Plaintiffs submitted evidence that Chicago supplied Amacker with thousands of midget aluminum turnbuckles as a load-bearing component of the Timb-R-Lock tree stand with actual knowledge that the stand was being sold so that purchasers could stand on it and that this type turnbuckle is not designed to support human weight.

As a result of plaintiffs' change of counsel, their former attorney delivered the tree stand and turnbuckle to their new attorney by courier. Plaintiffs filed their motion to add Chicago as a defendant about one week later. Plaintiffs' present attorney subsequently discovered he did not receive the turnbuckle. It thus appears the turnbuckle was lost in transit.

Letterman, his former attorney, and a metallurgical expert who conducted a visual inspection of the damaged turnbuckle testified

that, except for coloring, it was identical to an exemplar turnbuckle obtained by plaintiffs. During deposition questioning, Letterman testified he used a wrench to tighten the turnbuckle. When Amacker's counsel observed that one end of the turnbuckle looked "a little chewed up" and asked whether the damage was caused by the wrench, Letterman responded "[i]t may be, I don't know." An officer of Amacker who examined the lost turnbuckle averred in his affidavit that Letterman's fall was caused by product misuse.

1. In *Chapman v. Auto Owners Ins. Co.*,[1] the insurer of a store damaged by fire brought suit against the employer of individuals who had been working in the store. By examining and testing various electrical materials taken from the store, an investigative consultant hired by the insurer concluded that the fire was caused by the negligence of defendant's employees. The consultant ordered destruction of the material shortly after the suit was filed. Defendant moved the trial court to either dismiss the suit or preclude the plaintiff's expert from testifying about the destroyed evidence. The court ruled that under Georgia law, its only option was to charge the jury on the negative presumption created when evidence is spoliated.

The appellate court observed that allowing the case to proceed or an expert to testify about destroyed evidence which the opposing party is unable to test may result in trial by ambush which cannot be cured by a jury instruction. It was held that a trial court has authority to either exclude testimony concerning destroyed evidence or dismiss the case. Five factors were listed which a court of first instance should consider in determining an appropriate sanction: (1) whether the defendant was prejudiced as a result of the destruction of the evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the plaintiff acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not excluded.

2. Chicago argues that the lost turnbuckle is a critical piece of evidence and, without it, the Lettermans cannot establish any element of a prima facie case and Chicago cannot prove its defense. To establish defendant's strict liability, plaintiffs must prove that defendant is the manufacturer of the property, that the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended (i.e., defective), and that its condition when sold was the proximate cause of the injury sustained.[2] As a defense to a products liability claim, the defendant may show that

---

[1] 220 Ga. App. 539 (469 SE2d 783) (1996).

[2] See OCGA § 51-1-11 (b) (1); *Center Chem. Co. v. Parzini*, 234 Ga. 868 (1), 869 (2) (218 SE2d 580) (1975); *Lodge v. Champion Home Builders Co.*, 170 Ga. App. 21, 22 (3) (315 SE2d 912) (1984).

plaintiff's misuse of the product caused the injury.[3]

(a) Even in the absence of the original turnbuckle, there is abundant evidence that Chicago was the manufacturer. Letterman testified that he bought the Amacker Timb-R-Lock tree stand in 1990 at a certain retail outlet in Georgia, and that the turnbuckle was stamped with the numeral "5." Undisputed evidence shows that all Timb-R-Lock tree stands sold by Amacker to this retail outlet in 1989 and 1990 included a No. 5 turnbuckle supplied by Chicago. The Amacker officer who examined the failed turnbuckle testified that it was supplied to Amacker by Chicago.

Chicago claims it could not have been the manufacturer because the lost turnbuckle did not have any letter markings, unlike exemplars produced by plaintiffs. But in another suit resulting from the failure of a midget aluminum turnbuckle in an Amacker tree stand, an officer of Chicago testified that the turnbuckles are lettered if a problem occurs during manufacturing.

(b) Given the fact that plaintiffs' claim is based on the unfitness of thousands of turnbuckles for the purpose intended, as opposed to some idiosyncratic defect affecting only the lost turnbuckle, loss of the product does not impair either plaintiffs' ability to show the defect claimed or the defendant's ability to present a defense to the claim.[4]

(c) The trial court was authorized to find that even without the lost turnbuckle, plaintiffs can make a prima facie showing that its condition when sold was the proximate cause of Letterman's injury and that Chicago's product-misuse defense has not been irreparably prejudiced. According to plaintiffs, failure of the turnbuckle was caused by its splitting at the seam, thereby allowing an eyebolt to pull out of its thread. Chicago, on the other hand, asserts that exemplar turnbuckles failed under stress testing because the eyebolts straightened out rather than splitting, and photographs of the failed turnbuckle show an eyebolt that did not straighten out. Chicago also maintains that the midget aluminum turnbuckle is actually designed to withstand at least 480 pounds of tension without failing, rather than the 96-pound limit claimed by plaintiffs. If Chicago's testing produces the results it suggests, this would indicate that Letterman's damage to the turnbuckle rather than its unfitness for the purpose intended caused the product failure. Consequently, testing of the

---

[3] See *Gurin v. Gen. Motors Corp.*, 171 Ga. App. 159, 160 (1) (318 SE2d 830) (1984).

[4] Cf. *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F3d 76, 79-80 (3rd Cir. 1994) (where plaintiff's theory of the case is that all of defendant's products were defectively designed, defendant is not prejudiced by destruction of injury-causing product because of its ability to inspect and test like products); accord *Headley v. Chrysler Motor Corp.*, 141 FRD 362, 366, n. 18 (D. Mass. 1991).

exemplars, and use of the photographs of the original, may be used to verify or contradict the competing theories of causation advanced by the parties.

Moreover, where relevant evidence has been spoliated, the party's degree of fault is an important factor in determining whether the severe sanction of dismissal should be imposed.[5] The facts here authorized the trial court to find that the loss of the evidence in this case was unintentional and without plaintiffs' fault.

Although the record does not affirmatively show that the trial court applied all factors identified in *Chapman*, the court was aware of *Chapman* because it was cited by the parties in their trial briefs and at the motion hearing. We therefore presume the court applied the correct standard.

3. Chicago contends it is at least entitled to partial summary judgment on the issue of punitive damages.

"It has . . . been held that knowledge on the part of the seller of a component part that a purchaser intends to use it in a way that is found to be unreasonably dangerous subjects the supplier of the component part to strict liability in tort as well as the assembler."[6] Punitive damages may be awarded in tort actions if it is proven by clear and convincing evidence that the defendant's actions showed, among other things, a deliberate course of conduct which knowingly endangered product users.[7] Whether the evidence establishes that Chicago engaged in such conduct by the requisite standard of proof is a jury question. Summary judgment to Chicago was not warranted.

4. The rulings in the previous Divisions apply as well to the derivative loss of consortium claims of Letterman's wife.

*Judgment affirmed. Pope, P. J., and Ruffin, J., concur.*

DECIDED JANUARY 12, 1999.

*Drew, Eckl & Farnham, Bruce A. Taylor, Jr., James L. Creasy III, Hall F. McKinley III*, for appellant.
*John T. Ruff*, for appellees.

---

[5] See *Northern Assurance Co. v. Ware*, 145 FRD 281, 282, n. 2 (D. Me. 1993) (the most severe sanction of dismissal should be reserved for cases where a party has maliciously destroyed relevant evidence), cited in *Chapman*, supra at 542; *Graves v. Daley*, 526 NE2d 679, 681 (Ill. App. 1988) (in affirming dismissal of lawsuit, court notes that the case is not one in which evidence was innocently or negligently destroyed).

[6] Prosser & Keeton on Torts, § 100, p. 706 (5th ed. 1984).

[7] See *Uniroyal Goodrich Tire Co. v. Ford*, 218 Ga. App. 248, 255 (3) (b) (461 SE2d 877) (1995), rev'd in part on other grounds, *Ford v. Uniroyal Goodrich Tire Co.*, 267 Ga. 226 (476 SE2d 565) (1996); OCGA § 51-12-5.1.