## A09A1932. THE DIXIE GROUP, INC. v. SHAW INDUSTRIES GROUP, INC. et al.
## A09A2064. PERPETUAL MACHINE COMPANY v. STEVENS et al.
### (693 SE2d 888)

PHIPPS, Judge.

Daniel Stevens was fatally injured while performing mainte-nance on a machine at his place of employment, Shaw Industries Group, Inc. His widow, Vickie Stevens (Stevens), individually and as administrator of his estate, filed wrongful death actions against two defendants: (i) Perpetual Machine Company, the manufacturer of the machine; and (ii) The Dixie Group, Inc., a former owner of the machine before it was sold to Shaw. Dixie Group then filed a third-party complaint against Shaw.

Thereafter, four motions for summary judgment were filed. Perpetual and Dixie Group moved for summary judgment against Stevens, and the trial court denied both motions. In connection with the third-party complaint, Dixie Group and Shaw filed cross-motions for summary judgment. The trial court granted Shaw's motion and denied Dixie Group's motion.[1]

In Case No. A09A1932, Dixie Group appeals the rulings adverse to it. And in Case No. A09A2064, Perpetual cross-appeals the denial of its motion for summary judgment against Stevens. Regarding the contentions in Case No. A09A1932, the record shows that Dixie Group was entitled to summary judgment against Stevens; Dixie Group's contentions with respect to Shaw are therefore moot; the judgment is affirmed in part and reversed in part. There is no merit in any contention made in Case No. A09A2064; we affirm.

To prevail at summary judgment, the moving party must dem-onstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the nonmovant's favor, warrant judg-ment as a matter of law.[2] We review de novo a trial court's grant or denial of summary judgment, construing the evidence in a light most favorable to the nonmoving party.[3]

---

[1] This court has a duty to inquire into its jurisdiction to entertain each appeal. *Forest City Gun Club v. Chatham County*, 280 Ga. App. 219, 220 (633 SE2d 623) (2006). To the extent that the ruling in favor of Shaw is properly considered the grant of summary judgment, jurisdiction of these cases stems from OCGA § 9-11-56 (h); to the extent that the ruling in favor of Shaw is properly considered a declaratory judgment, see Division 5, infra, jurisdiction of these cases stems from OCGA § 9-4-2 (a). See *Sunstates Refrigerated Svcs. v. Griffin*, 215 Ga. App. 61, 62 (1) (449 SE2d 858) (1994) (recognizing that declaratory judgments have the force and effect of final judgments and are reviewable as such).

[2] OCGA § 9-11-56 (c); *Latson v. Boaz*, 278 Ga. 113 (598 SE2d 485) (2004).

[3] *Latson*, supra.

The machine in question, referred to as the wrapper, was used in the carpet industry. It wrapped thick plastic film around rolls of carpet for protection of the carpet during shipping and distribution. The plastic film was cut and sealed by a heat seal bar on the machine. After excess lengths of plastic film on either end of the carpet roll were manually tucked into the ends of the rolled-up carpet, pneumatically operated paddle arms (sometimes referred to as paddle rams or rams) on the machine then pressed cardboard inserts or plugs into the ends of the wrapped, rolled carpet.

Perpetual manufactured the wrapper in 1999, then sold it to nonparty Globaltex. At some point prior to 2003, defendant Dixie Group purchased the machine and the plant at which the incident later occurred. In November 2003, Dixie Group sold the plant (and the wrapper) to Shaw pursuant to an asset purchase agreement. When Dixie Group sold the plant, most of the employees who worked with the wrapper, including Daniel Stevens, began working for Shaw.

The underlying incident occurred on December 20, 2003. The operator of the wrapper experienced problems with the machine and called the maintenance department. Daniel Stevens, a Shaw maintenance technician, answered the call. While investigating, he noted that a bolt on one of the machine's paddle arms had become loose, as had been happening about every week or two. The paddle arms, located on either side of the machine and near the machine's frame, were operated by buttons located at the operator's station. As he had done many times before, Daniel Stevens instructed the operator to press and hold a button on the control panel — the ''ram-in'' button — so that he could tighten the bolt. The operator complied, which caused the paddle arms to move to an inward position (away from the machine's frame). Daniel Stevens then got into a position where he could forcibly tighten the bolt — between a paddle arm and the frame of the machine, as he had done about 50 times before. But this time, although the operator continued pressing the ram-in button, the paddle arm made an uncommanded movement and unexpectedly rammed back outward to its home position — where Daniel Stevens was working. Pinned against the frame by the paddle arm, Daniel Stevens was fatally injured.

Stevens's claims against Dixie Group (former owner of the wrapper) are premised upon negligence for failure to maintain, service, and repair the wrapper, as well as failure to warn. Stevens's claims against Perpetual (manufacturer of the machine) are premised upon strict liability and negligence. We consider first Perpetual's cross-appeal.

## Case No. A09A2064

1. Perpetual contends that it was entitled to summary judgment on Stevens's strict liability claim, given the following language in OCGA § 51-1-11:[4]

The manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person who may use, consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, *and its condition when sold is the proximate cause of the injury sustained*.[5]

Perpetual maintains that, at the time of the incident, the wrapper was not in its "when sold" condition. It insists that subsequent modifications to the machine, together with a lack of adequate maintenance thereupon, proximately caused Daniel Stevens's fatal injuries.

First, Perpetual points out that a switch located on the frame of the wrapper had been moved from its original position, including changing it from a horizontal position to a vertical one. This switch, called the proximity switch, assessed the position of the paddle arms in relation to the heat seal bar. The wrapper was designed such that when the proximity switch sensed that the heat seal bar was moving downward from its home position, the wrapper's computer software would move the paddle arms back to their home (outward) position. Stated differently, the proximity switch's function was to sense when the heat seal bar was in its "fully up" or "home" position. If the heat seal bar was out of that position (or, for whatever reason, the proximity switch did not sense the heat seal bar in that position), the wrapper's computer software would either prevent the rams from moving inward or force the rams outward. This automatic process prevented the heat seal bar and paddle arms from colliding with and thus damaging each other.

According to Perpetual's president, moving the proximity switch was a substantial modification. The Dixie Group maintenance technician who moved the switch in the spring of 2003, however, never spoke with anyone at Perpetual about changing the proximity switch

---

[4] See *Smith v. Chemtura Corp.*, 297 Ga. App. 287, 290-291 (3) (676 SE2d 756) (2009) (clarifying that OCGA § 51-1-11 is Georgia's strict liability Code section).

[5] OCGA § 51-1-11 (b) (1) (emphasis supplied).

or the potential effects of doing so. After the change, the switch sensed the presence of the heat seal bar from a different position.

In addition, when Perpetual's president inspected the wrapper several weeks after the incident, he noted that the electrical wiring in and around the proximity switch was "loose and spliced midway up the machine," which had not been the case when Perpetual sold the wrapper. Perpetual's president asserted that the movement of the proximity switch had placed it "in a position where it could be struck and damaged by the heat seal bar." Indeed, he noted, there were black marks on the proximity switch, indicating to him that the proximity switch had been struck and damaged.

Thus, according to Perpetual's president, moving the proximity switch altered the actual sensing distance and thus its original functioning. He further testified that either the damage to the switch, the spliced wiring, or a combination of the two had caused a "short circuit" in the switch. He asserted that had the modifications and damage to the proximity switch not occurred, the fatal incident would not have resulted.

The second modification that Perpetual cites concerns the bolt that Daniel Stevens was tightening at the time of the incident. The bolt supplied with the wrapper was secured by a lock washer, but there was no lock washer on the bolt when Daniel Stevens was injured. According to Perpetual's president, had the lock washer been present, the bolt "should not have come loose," and the repair would not have been necessary.

Perpetual's president also testified about additional observations he made with respect to the wrapper. Two of the three operator foot switches originally provided with the wrapper had been removed. In addition, there were air leaks around the cylinders that controlled the paddle arms and around the cylinders that controlled the heat seal bar. When the machine was sold, these cylinders did not leak. Perpetual argues that, because both the paddle arms and the heat seal bar were controlled by air pressure, leaking cylinders could significantly impact their operation.

To support its defense that these changes to the wrapper absolved it of strict liability, Perpetual cites *Talley v. City Tank Corp.*[6] for the following propositions: "One of the conditions for imposition of strict liability against a manufacturer of 'defective' products is that the product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.'"[7] "[I]f the design of that product has been independently altered, elimi-

---

[6] 158 Ga. App. 130 (279 SE2d 264) (1981).
[7] Id. at 135 (3) (citation, punctuation and emphasis omitted).

nated and replaced by a third party after the sale and injuries then result, those injuries cannot be traced to or be the proximate result of the manufacturer's original design which did not exist at the time of injury."[8] "A manufacturer has the absolute right to have his strict liability for injuries adjudged on the basis of the design of his own marketed product and not that of someone else."[9]

However, Stevens maintains that notwithstanding the cited changes, Perpetual's design of the interaction between the proximity switch, the heat seal bar, and the paddle arms caused the incident. Stevens cited evidence that Perpetual designed the machine with default software logic such that the paddle arms would automatically retract outward to their home positions — without warning and irrespective of an operator pressing the "ram-in" button. She further cited evidence that the wrapper could have been designed such that the default program did not automatically override operator commands. Moreover, Stevens's expert engineer deposed that he had inspected the machine after the incident and found no maintenance deficiencies that could have caused the incident. He recounted that his testing had not indicated "any issues with the splicing with regards to the control functions." And he testified that removing the operator foot switches originally provided with the wrapper had not affected, or required any adjustment to, the computer logic that controlled the heat seal bar and rams.

In addition, Stevens showed that the bolt could not be tightened without positioning one's body (or some part thereof) into the precise location where her husband was injured. She showed further that the original bolt assembly could have been loosened by the proper operation of the wrapper. And she showed that the area where Daniel Stevens was positioned when tightening the bolt did not have any guards preventing an individual from inserting any part of his or her body into that particular area.

Countering Perpetual's assertion that the movement of the proximity switch had *caused* the heat seal bar to strike the proximity switch, Stevens cited evidence that the heat seal bar was striking the proximity switch in its *original* position and that was the very reason the proximity switch was moved by the Dixie Group maintenance technician. According to that technician, the change had actually resolved the problem of the heat seal bar striking the proximity switch. There was evidence that after the change, the proximity switch continued to operate as designed.

---

[8] Id. at 134-135.
[9] Id. at 135 (citation and emphasis omitted).

Under this record, Perpetual has not shown that it was entitled to summary judgment for reason that the wrapper's condition when sold was not the proximate cause of Daniel Stevens's injuries. Construed in Stevens's favor, the evidence showed that the wrapper was designed to force its paddle arms outward to a location where a repairman could be positioned to repair a bolt shaken loose during normal operations of the machine, notwithstanding an operator's command that the paddle arms remain inward, and without any warning that the operator's command would be overridden. A jury would be authorized to find that the wrapper was operating as it had been designed when sold and that the design proximately caused Daniel Stevens's fatal injuries.

2. Perpetual contends that the trial court erred in denying its motion for summary judgment, asserting that Daniel Stevens assumed the risk of his injuries by attempting to perform maintenance on the machine without locking it out as he had been trained and instructed to do.[10] Perpetual cites evidence that Daniel Stevens had numerous years of experience as a maintenance technician at several companies, including Dixie Group and Shaw; that Daniel Stevens knew that, prior to working on any machine, the proper procedure was to lock it out; and that wrapper operators had complained to Daniel Stevens that the paddle arms sometimes returned to their home positions without command and sometimes would not respond to an operator pressing the "ram-in" button.

> The affirmative defense of assumption of the risk bars recovery when it is established that a plaintiff, without coercion of circumstances, chooses a course of action with full knowledge of its danger and while exercising a free choice as to whether to engage in the act or not. In Georgia, a defendant asserting an assumption of the risk defense must establish that the plaintiff (1) had actual knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed himself to those risks.[11]

Generally, whether a plaintiff assumed the risk of injury is an issue for the jury.[12]

---

[10] Stevens's engineering expert testified that "lockout" referred to removal of all stored energies, including electrical, mechanical, and pneumatic energies.

[11] *Muldovan v. McEachern*, 271 Ga. 805, 807-808 (2) (523 SE2d 566) (1999) (punctuation and footnotes omitted); see *Rubin v. Cello Corp.*, 235 Ga. App. 250, 252 (1) (b) (510 SE2d 541) (1998) (affirmative defense of assumption of the risk is available to the defendant in a product liability action).

[12] *Bass Custom Landscapes v. Cunard*, 258 Ga. App. 617, 619 (1) (575 SE2d 17) (2002).

Here, the evidence did not establish as a matter of law that Daniel Stevens acted "without coercion of circumstances." Another of Shaw's maintenance department technicians, who also had performed repairs on the wrapper during his employment with both Dixie and Shaw, including tightening the bolt at issue, testified that the bolt could not be tightened unless the machine was powered on.

Q: All right. Now, whenever you did the repair with the bolt there those three or four times, you didn't lock-out or tag-out anything?

A: No, you couldn't get to it by locking it out.

Q: Why not?

A: The cylinder that operates these rams are — it was the — the cylinder works on a residual; whenever it releases, it automatically goes all the way out. . . . And you had to — there was so much pressure and it was so close there you couldn't get a wrench in there to tighten that without the rams being moved in. . . .

Q: All right, so if you locked-out/tagged-out, the paddles would be out?

A: Yeah.

Q: So, the only way you could fix that bolt is to press the ram in button and then fix it?

A: Yes. . . .

Q: Now, what — are you saying that it is not possible at all to fix that bolt unless you press in the ram in button?

A: I never was able to tighten that bolt without the rams being pressed in.

Q: So, if you lock-out the machine, there's no way you can keep the rams in?

A: No.

Q: Is there anything you can turn off to make sure that the rams are in?

A: To my knowledge, there was no way that you could shut that off.

Q: Okay. So, the space . . . where that bolt is, you can't fix it, you can't fit a wrench in there?

A: You could not fit a wrench in there.

Q: Okay. So, there's no other way that you know of to fix that bolt without having someone — there's no other way to keep the paddles in without someone pressing that ram in button?

A: Correct.

Similarly, Stevens's engineering expert testified, "The only way to have [the ram] in the IN position was to have the machine active with the operator holding down the Ram In control." The engineer explained further, "[Y]ou could have [locked-out the wrapper,] but then the ram would have been in the Out position."

Given the foregoing evidence that the design of the machine rendered it impossible for the bolt repair to have been performed with the machine locked-out, whether Daniel Stevens "without coercion of circumstances" exposed himself to the risk and how much "free choice" he had to tighten the bolt by some other means should be resolved by a factfinder.[13] Consequently, summary judgment for Perpetual was not warranted under its defense of assumption of the risk.[14]

3. Given evidence of the design of Perpetual's machine, we find no error in the trial court's denial of its motion for summary judgment on the issue of punitive damages.[15]

*Case No. A09A1932*

4. Dixie Group contends that the trial court erred in denying its motion for summary judgment against Stevens on her negligence claims. Citing allegations and evidence presented by Perpetual in connection with the movement of the proximity switch,[16] Stevens maintains that Dixie Group negligently moved the proximity switch.[17] She maintains further that Dixie Group negligently failed to warn her husband of the dangers that evidence showed arose from its movement of the proximity switch.

> To state a cause of action for negligence in Georgia, the following elements are essential: (1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some

---

[13] See id. at 622-623 (2); see also *Bills v. Lowery*, 286 Ga. App. 301, 304 (3) (648 SE2d 779) (2007) (affirmative defense of assumption of the risk is not ordinarily susceptible of summary adjudication, and summary judgment is appropriate only where the evidence is plain, palpable, and indisputable).

[14] See *Bills*, supra.

[15] *Chicago Hardware &c. Co. v. Letterman*, 236 Ga. App. 21, 25 (3) (510 SE2d 875) (1999) (punitive damages may be awarded in tort actions if it is proven by clear and convincing evidence that the defendant's actions showed, among other things, a deliberate course of conduct which knowingly endangered product users).

[16] See Division 1, supra.

[17] Stevens specifically denies, however, that Perpetual's allegations and evidence limit Perpetual's liability with respect to her claims against Perpetual.

loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.[18]

Dixie Group's summary judgment motion contested, among other elements, the duty and proximate cause elements.

Dixie Group claims that at the time of the incident, it had no relationship with Daniel Stevens. It points out that it had sold the wrapper to Shaw prior to the incident, and at the time of the incident, it (Dixie Group) exercised no ownership or control over it, nor did it have any employees working on or around the machine.

Stevens counters that Dixie Group nevertheless owed her husband a duty, citing the cases of *Bills v. Lowery*,[19] *E & M Constr. Co. v. Bob*,[20] and *Griffith v. Chevrolet Motor Division &c.*[21] Those cases recognize that a repairman owes a duty to use ordinary care in making the repairs he has agreed to do for another.[22] Indeed, "Georgia law imposes an obligation upon everyone who attempts to do anything, even gratuitously, for another, to exercise some degree of care and skill in the performance of what he has undertaken."[23] However, we find those cases inapposite. There is no evidence that Dixie Group undertook repair of the wrapper for another. Furthermore, Dixie Group's apparent business decision to repair its machine within its own maintenance department did not give rise to any relationship with Daniel Stevens in which Dixie Group was a repairman so as to comport with those cases.[24]

We agree with Dixie Group that Stevens has failed to demonstrate that Dixie Group, which no longer owned nor controlled the wrapper, nevertheless was subject to liability to Daniel Stevens, who

---

[18] *Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 200 (296 SE2d 693) (1982) (citation and punctuation omitted).

[19] Supra.

[20] 115 Ga. App. 127 (153 SE2d 641) (1967).

[21] 105 Ga. App. 588 (125 SE2d 525) (1962).

[22] See *Bills*, supra at 302 (1) (where tire repairman agreed to repair motorist's blown-out tire of motor home, repairman was required to exercise ordinary care in making such repairs; thus, trial court erred in granting repairman summary judgment upon negligence claim arising from fatal injuries suffered when elevated motor home fell off jack and onto motorist); *E. & M. Constr. Co.*, supra at 127-128 (law imposes upon a contractor duty not to negligently and wrongfully injure and damage property of another; thus, where contractor agreed to repair and re-side plaintiff's house, but then removed siding in wet weather and failed to repair or replace it and failed to protect house from foreseeable damage from the elements, trial court correctly overruled contractor's general demurrer); *Griffith*, supra at 593-596 (2) (b) (where car dealer undertook to inspect and repair purchaser's truck, car dealer could be held liable for injuries caused by negligent repairs).

[23] *Allstate Ins. Co. v. Sutton*, 290 Ga. App. 154, 158 (3) (a) (658 SE2d 909) (2008) (punctuation and footnote omitted).

[24] Compare *Griffith*, supra at 593 (noting that car dealer's agreement with its customer, wherein car dealership agreed to repair the truck it sold to the customer, gave rise to an employer-independent contractor relationship in which car dealership was a repairman).

was subsequently fatally injured by the machine.[25] As were the circumstances in *Dupree v. Keller Indus.*,[26]

> [t]he undisputed evidence was that there were no injuries to those operating the [wrapper] during [Dixie Group's] ownership and use. Even if . . . [Dixie Group] knew or should have realized that the [wrapper] was or was likely to be dangerous for the use for which it was supplied, there was a complete absence of evidence that [Daniel Stevens] would not realize the [dangers]. In fact, the evidence . . . point[s] to the opposite conclusion.[27]

And given undisputed evidence that Daniel Stevens was explicitly told that the wrapper's paddle arms occasionally retracted in disregard of operator command, Stevens cannot show that any failure by Dixie Group to warn her husband of what he already knew proximately caused his injuries.[28] Under these circumstances, the trial court erred by failing to grant Dixie Group's motion for summary judgment.[29]

5. Dixie Group contends that the trial court erred in its rulings on cross-motions for summary judgment between it (as third-party plaintiff) and Shaw (as third-party defendant). Dixie Group maintains that, pursuant to their asset purchase agreement with Shaw, Shaw was required to indemnify and hold it harmless from damages arising in connection with the machine. The trial court declared otherwise. Given our holding in Division 4,[30] this contention is moot.

*Judgment affirmed in part and reversed in part in Case No. A09A1932. Judgment affirmed in Case No. A09A2064. Smith, P. J., and Bernes, J., concur.*

DECIDED MARCH 26, 2010 —
RECONSIDERATION DENIED APRIL 7, 2010 — ▮▮▮▮▮

*Hicks, Casey & Foster, William T. Casey, Jr.,* for appellant (case no. A09A1932).

---

[25] See *Dupree v. Keller Indus.*, 199 Ga. App. 138, 141 (1) (404 SE2d 291) (1991) (where defendant owes no legal duty to the plaintiff, there is no cause of action in negligence; what duty a defendant owed a plaintiff is a matter of law).

[26] Id.

[27] Id. at 143-144 (2).

[28] See *Bodymasters Sports Indus. v. Wimberley*, 232 Ga. App. 170, 174-175 (2) (501 SE2d 556) (1998) (because plaintiff was aware of the danger she claimed she should have been warned against, the failure to post signs warning of such danger could not have been the proximate cause of her injury).

[29] See id.; *Dupree*, supra.

[30] Supra.

*Scrudder, Bass, Quillian & Horlock, Glenn S. Bass*, for appellant (case no. A09A2064).

*Hawkins & Parnell, William H. Major III, Martin A. Levinson, Castan & Lecca, R. James Babson, Jr., Kenneth W. Brosnahan, Linda G. Carpenter*, for appellees.