**FOURTH DIVISION**
**DOYLE, P. J.,**
**MCFADDEN and BOGGS, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 9, 2013**

# In the Court of Appeals of Georgia

A13A0696. HAZEL LEE, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF ROBERT ALEX LEE v. CNH AMERICA, LLC. et al.

BOGGS, Judge.

In this product liability action, Hazel Lee, the wife and executrix of Robert Lee, appeals from a defense verdict in favor of CNH, America, LLC, and CNH Italia (collectively "CNH").[1] Mrs. Lee contends on appeal that the trial court erred in charging the jury on assumption of the risk, misuse of a product, and spoliation. She also asserts that the trial court erred by allowing a 30 (b) (6) defense witness to give expert opinion testimony. Based upon the "any evidence" standard of review on appeal, the trial court did not err in its charges, and Mrs. Lee cannot demonstrate

---

[1] CNH Italia manufactured the tractor at issue, and CNH America marketed, distributed, and sold the tractor.

prejudice resulting from the alleged opinion testimony offered by the defense witness. We therefore affirm.

The record shows that a new tractor manufactured by the defendants was delivered to Robert Lee on April 30, 2007. Three days later, on May 3, 2007, his wife found his body trapped between the elevated cultivator and the rear tractor wheel with the engine running. The evening before Mr. Lee's death, he called his brother-in-law and told him that he loved his new tractor, that "the lift was all the way up or all the way down," and asked him to "come that Saturday to try to help him figure out what it was." Evidence presented at trial showed that Lee had owned three or four tractors for over 35 years before purchasing the CNH tractor, was mechanically inclined, and "could fix anything."

The tractor included a "lift-o-matic" feature (also called "the fast raise/fast lower system") that allowed the operator to flip a single switch to quickly raise or lower any attached implement. This switch was located on the right side of the operator's seat. The tractor also included a height limit adjustment knob that was used to adjust the preset height at which an attached implement would raise when the lift-o-matic switch was in the "fast raise" position. This knob was located on the rear of the tractor behind the operator's seat. In order to adjust the preset height, the operator

would have to get out of the operator seat and go behind the tractor "in between the tractor and the implement." If the height limit adjustment knob is *loosened* while the tractor is running and the lift-o-matic switch is in the fast raise position, the implement will instantly raise to its full height.

It is undisputed that Lee read the operator's manual for the tractor "every night" and that he received a copy before the tractor was delivered. The operator's manual contained numerous warnings about turning the tractor engine off before servicing or adjusting the tractor or its implements. Additionally, the portion of the manual addressing the height limit adjustment feature instructed the operator to place the lift-o-matic feature in the fast *lower* position and to "switch off the engine" before loosening the knob. If the lift-o-matic feature had been placed in fast lower *or* the engine had been turned off, Lee would not have been crushed during any attempt to adjust the knob while standing between the implement and the tractor. Finally, a sticker on the right rear fender of the tractor stated: "Lift raises or drops completely when fast raise/lower lift control is operated. Do not stand on the implement or in between implement and tractor while operating fast raise/lower lift control or injury may result." The jury heard evidence that, two months after Lee's death, CNH

3

changed the warning on its tractor and in its manual "related to the height limit adjustment feature and being back there with the engine running."

The salesperson that sold the tractor to Lee testified that when he delivered the tractor, Lee asked him to explain the fast raise and lower system. The salesperson explained the proper procedure and demonstrated it "half a dozen or more times" before asking Lee to "do it two or three times." When "demonstrating the proper procedure to adjust the height limit function," the salesperson "instruct[ed] him to turn the engine off before loosening the knob." The salesperson did not tell Lee he would be exposing himself to danger or risk if he failed to turn the engine off because Lee had "been around tractors and equipment all his life" and it would have been insulting to tell him something he already knew. According to the salesperson, the risk of going between the tractor and the implement when the engine was running was "open and obvious" and one which he believed that Lee understood. After spending almost two hours with Lee, the salesperson believed that Lee knew how to use the lift-o-matic and height limit control features properly and that Lee understood that the engine should be off when the height limit was adjusted. Each time the salesperson or Lee practiced adjusting the height control in the back of the tractor, they turned the engine off before doing so.

4

While CNH's counsel asked Lee's counsel to inspect the tractor on July 5, 2007, less than two months after the accident and before any lawsuit had been filed, their request was refused, and they were not allowed to do so until August 2009, over two years after Lee's death and four months after Mrs. Lee filed her complaint. In the intervening period, the tractor was inspected by two consultants on behalf of Mrs. Lee, and her son operated the tractor during the inspection, doing "what they told me to do." During his testimony at trial, the son denied that he or the consultants turned any knobs behind the tractor. On February 2, 2009, the tractor was transferred to Benedict Engineering in Florida and stored in unknown conditions. On July 13, 2009, the tractor was moved to Weil Wrecker in Birmingham, Alabama and stored in an enclosed building that may not have had climate control.

During his inspection of the tractor in August 2009, a product performance specialist with CNH,[2] John Bucher, obtained permission from plaintiff's representative before loosening the height adjustment knob. Bucher testified at trial

---

[2] Bucher's background and training included: diplomas from high school and a technical school for welding and blueprint reading, work as a service technician and manager for a John Deere dealership, completion of a four-year prototype specialist training program with Ford New Holland, eight years work building and testing prototype tractors and hay tools, seven years work in product technical support, and four years work as a performance specialist. CNH sells New Holland tractors.

that "[t]he first time I went to loosen the knob I made the comment, wow, it's tight and I couldn't loosen it, . . . it was extremely tight." He assumed that the cam may have been paint stuck which "would eliminate the possibility that Mr. Lee loosened the knob and the lift came up." When he later learned from the dealer that the cam was loosened before delivery, he eliminated the paint stuck theory.

The record shows that Bucher testified in his deposition about the following "possibilities" of what may have happened to Lee : (1) "Lee was behind the tractor and the engine was running, someone else could have been on the seat and could have hit the fast raise/lower or could have raised the position lever;" (2) "[w]hile Lee was behind the tractor, he could have reached up over the rear of the tractor and stood on the three-point hitch arm and reached up over the tractor and either latched or unlatched the fast raise/lower into the raised position . . . and maybe lost balance and fell off and . . . at that point, the whole three-point hitch was coming up the whole way;" and (3) "[t]here's a possibility that he chose to keep the engine running and went back there and tried to adjust the height limit control." At trial, Bucher testified that scenario number 3 could not happen if the knob was as tight at the time of the accident as it was during his inspection. He explained that he heard several times

6

during the trial "that the height limit adjustment was not touched before [his] inspection." He testified that as a result, he now leaned toward scenario number 2.

During cross-examination, plaintiff's counsel elicited testimony that the tractor was stored outside for some period after Lee's death, pointed to pictures showing rust around the cam and the knob at the time of Bucher's inspection two years later, and suggested that rust can cause mechanical equipment to tighten up. During redirect, Bucher testified that he wanted to the inspect the tractor as soon as he could after the accident "in as pristine a condition as possible . . . before anything had a chance to tighten."

At trial, the plaintiff's expert, with a Ph.D. in mechanical engineering, testified that during his August 2010 inspection of the tractor (one year after CNH inspected the tractor), he discovered that he could not adequately tighten the height adjustment knob with an ungloved hand, but admitted on cross-examination that he was missing the index finger on his right hand and that he may have weakened hand strength. When he tightened it with an ungloved hand, the implement would come all the way up instead of to the preset height because the cam would slip. He also testified that the tractor should have been designed so that the operator could adjust the preset height limit without "get[ting] into the hazard zone between the back of the tractor

7

and the implement," a lever instead of a knob should have been used to adjust the preset height limit so that it could be adjusted with an ungloved hand, and manual and decals on the tractor did not adequately warn of the danger of adjusting the preset height limit while standing between the tractor and implement with the engine running.

Plaintiff's expert also addressed Bucher's three accident scenarios and concluded that there were no facts to support scenario number (1), and scenario number (2) was not likely based upon the position of Lee's body when he was discovered. In his opinion, Lee "more likely than not, . . . was in there trying to figure out what was going on with this height limit adjustment and the mechanism came up on him and trapped him." He acknowledged that "Lee obviously made a mistake in getting between the implement of the tractor and the rear of the tractor while it was running."

He also testified to his "observation that if this thing is not tight enough or if it's moved just a little bit, what we observed in this video was that just shaking the plow caused it to come up, but if you move the adjustment knob, it's going to come up and it's going to get you. And if you're in that mouse trap when it comes up, I think you're caught." In his opinion, "there was a problem with the height limit

adjustment feature being able to maintain the level or the preset position of the height limit adjustment feature" due to a "too small" diameter for the adjustment knob.[3] The expert did not know whether Lee "twisted the knob and it got him or if it just came up when he was in that area." Finally, he testified that it was reasonably foreseeable to CNH "that somebody would be between the implement and the tractor with the engine running." He admitted during cross-examination that the crush hazard was "obvious" and that an experienced user would "understand that if the lift come[s] up, they will get crushed. It's sort of like walking across the street. People walk across the street everyday. They know that if the truck hits them, they're going to be smashed, but they think they can make it across the street."

1. (a) Mrs. Lee contends that the trial court erred by giving the pattern jury charge on assumption of the risk based upon the alleged lack of evidence that Lee had subjective knowledge "of the danger for death and serious injuries posed by going between the tractor and the implement while operating the lift-o-matic feature when the engine was running." The suggested pattern jury charge on assumption of the risk for product liability cases given by the trial court provides:

---

[3] CNH submitted evidence that over 35,000 tractors had the same size adjustment knob and no incidents of it not being able to hold the cam had been reported to them.

9

If a person knows of a product's defect and is aware of the danger but nevertheless proceeds unreasonably to make use of the product, he/she cannot later hold another person responsible for any injury suffered due to taking such a risk. If you find by a preponderance of the evidence that

1)   the plaintiff knew of the danger posed by the defective product,

2)   the plaintiff understood and appreciated the risks of that defect, and

3)   the plaintiff knowingly and voluntarily exposed himself/herself to such a risk, then the plaintiff would not be entitled to recover for the resulting injury or damages, and you would return a verdict for the defendant.

Suggested Pattern Jury Instructions, Vol. I: Civil Case § 62.710 (5th ed. 2007).

CNH argues that this charge was warranted based upon the evidence that Lee told his brother-in-law that the lift-o-matic feature of the tractor was malfunctioning (either all the way up or all the way down), that Lee may have been behind the tractor with the engine running to investigate this known malfunction, that the area between the tractor and the implement was an obvious crush zone, that Lee had read the manual which instructed the operator to turn off engine before attempting to adjust the height limit, that the proper procedure to adjust the height limit with the engine

10

turned off was demonstrated to Lee multiple times, and that Lee practiced doing it correctly multiple times.

The trial court did not err by giving the pattern charge on assumption of the risk in this product liability case. See *The Dixie Group v. Shaw Indus. Group*, 303 Ga. App. 459, 464-466 (2) (693 SE2d 888) (2010) (issue of whether decedent assumed risk of working "on the machine without locking it out as he had been trained and instructed to do" for jury to determine). "When there is any evidence, *however slight*, upon a particular issue, it is not error for the court to charge the law in relation to the issue." (Citation and footnote omitted; emphasis supplied.) *Deloach v. Deloach*, 258 Ga. App. 187, 189-190 (3) (573 SE2d 444) (2002).

> We will not overturn a trial court's decision to give a particular jury charge if there was *any evidence* presented at trial to support giving the charge. In determining whether some evidence exists to support an instruction, an appellate court is not authorized either to weigh existing evidence or to judge witness credibility as these matters are within the province of the jury.

(Citation and punctuation omitted; emphasis supplied.) *Collins v. Mitchell*, 282 Ga. App. 860, 861 (1) (640 SE2d 364) (2006). Additionally, circumstantial evidence may be used to "infer that [the injured party] must have known and understood the alleged

11

defect and danger flowing therefrom prior to the incident." *Coast Catamaran Corp. v. Mann*, 171 Ga. App. 844, 846 (1) (321 SE2d 353) (1984), overruled on other grounds, *Banks v. ICI Ams.*, 264 Ga. 732, 734 (1) (450 SE2d 671) (1994).

(b) Likewise, the trial court did not err by refusing to give the assumption of the risk charge offered by Lee. While this charge may have provided additional explanation about the subjective knowledge required for an assumption of the risk defense, see generally *Muldovan v. McEachern*, 271 Ga. 805, 808 (2) (523 SE2d 566) (1999), the pattern charge given by the trial court adequately covered the principle. See *Barger v. Garden Way*, 231 Ga. App. 723, 728-729 (7) (499 SE2d 737) (1998) (finding no error in charge when substance of requests was thoroughly and accurately stated in product liability case).

2. Mrs. Lee asserts that the trial court erred "in allowing the defendants to assert 'misuse of product' as an affirmative defense when the decedent's use was reasonably foreseeable to the defendants." The trial court gave the following suggested pattern jury charge:

> A product that is safe if used in a normal manner is not ordinarily a defective product. If a person uses a product in an abnormal manner and is injured because of such abnormal use, the manufacturer is not liable for such injury. However, if the manufacturer had reason to anticipate

or foresee that the product might be used in this abnormal manner and that such use might result in injury and, knowing these facts, failed to give adequate warning against using the product in this manner, then the manufacturer may be held liable for the resulting injury.

Suggested Pattern Jury Instructions, Vol. I: Civil Case § 62.681 (5th ed. 2007).

The trial court did not err by giving this charge based upon evidence showing that Lee was found behind the tractor with the engine running and that the decals on the tractor and instructions in the manual instructed the operator to turn the engine off. The jury was authorized from this evidence to consider whether Lee used the tractor in an abnormal manner, whether the abnormal use was foreseeable to CNH, and whether CNH gave an adequate warning against any such misuse. The trial court did not err by giving the pattern jury charge on misuse of a product. See *Gurin v. Gen. Motors*, 171 Ga. App. 159, 160 (1) (318 SE2d 830) (1984) (trial court did not err by giving charge on misuse in product liability case).

3. Mrs. Lee maintains that the trial court erred by charging the jury on spoliation. As the trial transcript does not include the charge conference, we cannot determine what findings may have been made by the trial court before it decided to give the spoliation charge. The trial court denied CNH's motion for summary judgment based upon spoliation before trial; that motion was grounded only upon the

13

refusal to allow it to inspect the tractor two months after the accident and the inspection by two unidentified consultants before they were provided an opportunity to inspect the tractor.

At the beginning of trial, the trial court ruled that CNH could cross-examine witnesses about the inspection by the consultants and the refusal of their request for an inspection, but not use the word spoliation in its opening statement or during cross-examination. Immediately before the charge conference, which was not transcribed, CNH's counsel mentioned that it was entitled to a spoliation presumption based upon cross-examination attempting to show that the adjustment knob was tight at the time of Bucher's inspection due to rust.

"Spoliation refers to the destruction or failure to preserve evidence that is necessary to contemplated or pending litigation. Such conduct creates the presumption that the evidence would have been harmful to the spoliator." (Citations omitted.) *Clayton County v. Austin-Powell*, Ga. App. (2) (740 SE2d 831) (2013). "A trial court has wide discretion in resolving spoliation issues, and we will not disturb the court's ruling absent abuse." (Citations and punctuation omitted.) *Kitchens v. Brusman*, 303 Ga. App. 703, 705 (1) (694 SE2d 667) (2010).

14

In this case, there is no question that the evidence existed and that litigation was contemplated at the time CNH's request to inspect the tractor was denied, because the request letter was sent by CNH's counsel to Mrs. Lee's counsel. Based upon plaintiff's counsel's attempt to show during the trial that the tightness of the critical knob was due to rust, the trial court did not err by charging the jury on the general presumption arising against a party who failed to preserve evidence necessary to contemplated or pending litigation. As there was evidence supporting the trial court's decision to charge on spoliation, we cannot conclude that it erred by giving this charge. See generally *DeLoach*, supra ("any evidence" standard of review for jury charges); *Pacheco v. Regal Cinemas*, 311 Ga. App. 224, 226-227 (1) (b) (715 SE2d 728) (2011) (trial court did not err by giving charge on presumption arising from spoliation).

Plaintiff's claim on appeal that the charge was inappropriate because there was no evidence showing that she allowed rust to develop in bad faith has no merit. See *Amli Residential Properties v. Georgia Power Co.*, 293 Ga. App. 358, 363 (1) (a) (iii) (667 SE2d 150) (2008) ("Exclusionary sanctions may be appropriate where the spoliator has not acted in bad faith"). Likewise, plaintiff's claim that the trial court erred by failing to make factual findings has no merit, particularly when the charge

15

conference was not transcribed. See *R&R Insulation Svcs. v. Royal Indem.*, 307 Ga. App. 419, 436 (7) (a) (705 SE2d 223) (2010) (affirming trial court's decision on spoliation based upon our obligation on appeal "to presume that the trial court knows and applies the correct law").

4. In her remaining enumeration of error, Mrs. Lee contends that the trial court erred by allowing CNH witness John Bucher to offer expert opinions when he was never disclosed or qualified as an expert. We are not persuaded by this contention, however, because the record shows that at the beginning of the trial, Mrs. Lee's counsel agreed that Bucher could testify "based on his firsthand knowledge as the corporate representative, and as long as we're sticking to that, that's in his deposition, then I don't have a problem." Additionally, the expert witness retained by Mrs. Lee testified at trial about each of the three scenarios outlined by Bucher in his deposition *before* Bucher testified about them, and admitted that scenario number 3 was impossible if the adjustment knob was tight and the machine was operating properly at the time of the accident.

Based on this evidence, Mrs. Lee cannot establish any harm flowing from Bucher's alleged expert testimony. Bucher's testimony that the knob was tight at the time of his inspection was a factual observation, not an expert opinion, and his

testimony that he could rule out scenario number 3 based upon the tightness of the knob and testimony at trial that the knob had not been moved before his inspection was cumulative of the plaintiff's expert's testimony during cross-examination. See, e. g., *Yang v. Smith*, 316 Ga. App. 458, 466 (2) (b) (ii) (728 SE2d 794) (2012).

Based on our holdings in Divisions 1-4, we affirm the jury's verdict in favor of CNH.

*Judgment affirmed. Doyle, P. J., and McFadden, J., concur.*