Ray, Judge.
Defendants BellSouth Telecommunications, LLC, and Earth-link, Inc., Earthlink, LLC, Deltacom, LLC, and Business Telecomm, LLC (collectively, “Defendants”), filed this interlocutory appeal from the trial court’s denials of their motions to dismiss the complaints by Cobb County and Gwinnett County (collectively, the “Counties”) regarding the Defendants’ alleged violations of the Georgia Emergency Telephone Number 9-1-1 Service Act of 1977, OCGA § 46-5-120 et seq. (the “9-1-1 Act”).[1] The 9-1-1 Act requires telephone customers to pay a monthly charge to the telephone companies, which act as middlemen to collect and remit the collected charges to local governments that run 9-1-1 call centers and dispatch emergency services. See OCGA § 46-5-134 (a), (b). The Counties allege that the Defendants purposefully did not bill — and therefore, their customers did not pay — enough 9-1-1 charges under the statute. The Counties seek to hold the Defendants liable for damages equal to the amount of 9-1 -1 charges owed by their customers, as well as for punitive damages.
We agree with the Defendants that the 9-1-1 Act does not explicitly or implicitly sanction a direct right of action by the Counties against the Defendants due to their alleged failure to bill or collect the required fees, but also find that the Counties may pursue their claims against the Defendants for the alleged failure or refusal to collect the *324 9-1-1 charges pursuant to OCGA §§ 51-1-6 and 51-1-8. However, the viability of any common law claims may turn on whether the 9-1-1 charges are taxes or fees. As any decision thereon is premature at this stage of the proceedings, we remand this issue for further consideration.

Background

In 1977, the General Assembly passed the 9-1-1 Act to “establish and implement a cohesive state-wide emergency telephone number 9-1-1 system which will provide citizens with rapid, direct access to public safety agencies by dialing telephone number 9-1-1 [.] ” OCGA § 46-5-121 (a). The 9-1-1 Act authorizes a local government to pay for the 9-1-1 services it provides by “imposing] a monthly 9-1-1 charge upon each telephone service” that is or would be served by the 9-1-1 service. OCGA § 46-5-133 (a). The 9-1-1 Act broadly describes “telephone service” as “any method by which a 9-1-1 emergency call is delivered to a public safety answering point[,]” and includes
local exchange telephone service or other telephone communication service, wireless service, prepaid wireless service, mobile telecommunications service, computer service, Voice over Internet Protocol service, or any technology that delivers or is required by law to deliver a call to a public safety answering point.
OCGA § 46-5-122 (16.1).
The 9-1-1 Act makes telephone companies intermediaries between local governments and citizens for the purpose of collecting the funds necessary to implement the 9-1-1 service and dispatch centers. It provides that telephone customers “may be billed for the monthly 9-1-1 charge” of up to $1.50 for each subscription per telephone service provided. OCGA § 46-5-134 (a) (1) (A).[2] The specific language of the Act provides:
Each service supplier shall, on behalf of the local government, collect the 9-1-1 charge from those telephone subscrib *325 ers to whom it provides telephone service in the area served by the emergency 9-1-1 system. As part of its normal billing process, the service supplier shall collect the 9-1-1 charge for each month a telephone service is in service, and it shall list the 9-1-1 charge as a separate entry on each bill. . . .
OCGA § 46-5-134 (a) (1) (B). The same requirement applies to wireless service, except for services billed to federal, state or local governments. See OCGA § 46-5-134 (a) (2) (C). Further, “[e]ach service supplier that collects 9-1-1 charges” may “retain ... an administrative fee” and “[t]he remaining amount shall be due quarterly to the local government^]” OCGA § 46-5-134 (d) (1). The 9-1-1 Act further grants local governments the right to “audit or cause to be audited the books and records of service suppliers with respect to the collection and remittance of 9-1-1 charges.” OCGA § 46-5-134 (d) (4).
The Counties sued the Defendants alleging that they should have billed two classes of customers a larger amount of 9-1-1 charges. The Counties argued that Defendants were required to, but did not, bill a 9-1-1 charge for all of the “exchange access lines, channels, or pathways” available to customers that purchased “multiplex” services, which can carry multiple simultaneous calls over a single physical line, and that Defendants were required to, but did not, bill a 9-1-1 charge for every ten-digit telephone number provided to users of VoIP technology.[3] The complaints, inter alia, assert damages claims arising out of these alleged violations of the 9-1-1 Act and arising out of common law theories of recovery and seek to enforce the 9-1-1 Act’s audit provision.
The Defendants moved to dismiss the Counties’ complaints. After a consolidated oral argument, the trial court denied the motions to dismiss.[4] In its order, the trial court held that the 9-1-1 charges *326 constitute fees, rather than taxes; that the lawsuit was permissible because there is “no express language” preventing the Counties from bringing the action and that “[i]t is implausible that the General Assembly would confer auditing powers without a corresponding remedy” and that the Counties could enforce the 9-1-1 Act through common law claims based on alleged violations of the 9-1-1 Act. This Court granted the Defendants’ application for interlocutory review.

Analysis

1. The parties agree that the 9-1-1 Act does not contain an express right of action authorizing local governments to enforce the statute against telephone companies and service suppliers. However, the plaintiff Counties allege and the trial court found that the statutory scheme of the 9-1-1 Act indicates an intent by the General Assembly to give local governments an implied right of action for damages against telephone companies and suppliers based upon a violation of the statute. The trial court reasoned that it was implausible that the General Assembly would confer auditing powers to local governments without a corresponding remedy if they were to discover that a telephone company or service supplier had not collected and/or remitted the proper amount owed to them under the statute. The Defendants argue that this ruling was in error; we agree that the trial court so erred.
Georgia has “longstanding precedential authority rejecting the creation of implied private rights of action[.]” Somerville v. White, 337 Ga. App. 414, 417 (1) (787 SE2d 350) (2016). See also Govea v. City of Norcross, 271 Ga. App. 36, 41 (1) (608 SE2d 677) (2004) (“[I]t is well settled that violating statutes and regulations does not automatically give rise to a civil cause of action by an individual claiming to have been injured from a violation thereof”). In 2010, the General Assembly codified this presumption in OCGA § 9-2-8 (a), which provides that “[n]o private right of action shall arise from any Act enacted after July 1, 2010, unless such right is expressly provided therein.” Our Supreme Court has noted that the creation of OCGA § 9-2-8 revealed the General Assembly’s concern over “judicial creation of implied civil causes of action[.]” Anthony v. American Gen. Financial Svcs., 287 Ga. 448, 459 (2) (c) (697 SE2d 166) (2010). Although OCGA § 9-2-8 (a) “would not apply to the preexisting [9-1-1 Act] at issue in this case,... it certainly counsels against deviating from our established precedent to find new implied civil causes of action.” Id.
As noted above, all parties concede that the 9-1-1 Act does not contain an express right of action that would allow the Counties to bring the claims in this lawsuit against the Defendants. See generally *327 OCGA § 46-5-120 etseq. Accordingly, the Counties bear the burden of overcoming Georgia’s presumption against implied rights of action. See Brooks-Powers v. MARTA, 260 Ga. App. 390, 392 (1) (579 SE2d 802) (2003). This they cannot do.
Although the 9-1-1 Act does not provide that local governments have a right of action against telephone compan ies, it does provide a similar right of action against telephone customers. Specifically, the 9-1-1 Act provides that telephone customers are “liable for the 9-1-1 charge[ ] . . . until it has been paid to the service supplier.” OCGA § 46-5-134 (b). Under the 9-1-1 Act, if a customer refuses to pay the 9-1-1 charge, then the telephone company is to inform the local government, which may “initiate[ ]” a “collection action” against that customer. Id. While the legislature also could have specifically created a cause of action for a breach of the 9-1-1 Act against telephone service providers by its terms, it did not choose to do so.
Not to be deterred, the Counties claim and the trial court held that the audit provisions of the 9-1-1 Act gave rise to an inference that the General Assembly intended that local governments could sue telephone service providers. See OCGA § 46-5-134 (d) (4) (The 9-1-1 Act provides that a “local government may on an annual basis, and at its expense, audit or cause to be audited the books and records of service suppliers with respect to the collection and remittance of the 9-1-1 charges”). However, again, had the General Assembly intended within the statute itself to make the Defendants or other telephone service providers liable for amounts not collected from customers, then it knew how to do so.[5] See, e.g., OCGA § 48-8-7 (a), (b) (making it “unlawful for any dealer to knowingly and willingly fail, neglect, or refuse to collect” from its customers a sales and use tax, and imposing a “penalty of being liable for and paying the tax himself” if a dealer violates the statute).[6]
Contrary to the Counties’ assertion, it is plausible that the General Assembly would make service providers subject to an audit *328 (but not confer a right of action against them) since the service providers are the parties that hold the records regarding the 9-1-1 taxes charged to and paid by others, namely, their customers.[7] Further, the audits could lead to retroactive collection by the local governments against end-users who did not pay the appropriate amounts of 9-1-1 charges or lead to prospective changes to the service supplier’s manner of billing.
The Counties next allege that an implied right of action exists because the 9-1-1 Act gave them the power to “bring and defend actions.”OCGA § 46-5-138(c) (1). However, thefactthatthe Counties may sue or be sued does not confer a right of action; it merely confers the capacity to sue. The Eleventh Circuit rejected a similar argument in Smith v. Russellville Production Credit Assn., 777 F2d 1544, 1548 (I) (11th Cir. 1985). Smith held that the appellants’ argument
in support of an implied right of action, that the inclusion of a “sue and be sued” provision in the Farm Credit Act is evidence that Congress intended to create a private right of action under that act, is completely without merit. The “sue and be sued provision” simply indicates that Congress intended that [Production Credit Associations (“PCAs”)], like other private entities, be held accountable for breaking the law and be able to seek relief under appropriate circumstances. The provision does not indicate that Congress intended, in enacting the Farm Credit Act, to create an independent substantive legal basis under which PCAs could be sued.
Id.
In summary, we disagree with the trial court’s finding that the 9-1-1 Act provides an implied right of action to the Counties for the Defendants’ alleged failure to collect the proper amount of fees under the statute.
2. The Defendants next argue that the trial court erred in concluding that the 9-1-lAct, when read in conjunction with OCGA §§ 51-1-6 and 51-1-8, provides the Counties with common law remedies against the Defendants or any other telephone service provider. As to this point, we hold that the Counties may pursue claims against the Defendants due to their alleged failure or refusal to collect these charges; the 9-1-1 Act imposed a duty upon the Defendants to do so, *329 and OCGA §§ 51-1-6 and 51-1-8 allow the Counties to enforce that statutorily imposed duty.[8]
“The language of OCGA §§ 51 -1 -6[9] and 51-1-8[10] does not confer a separate cause of action in tort upon one who has suffered a breach of a legal or a private duty” Parris v. State, 229 Ga. App. 522, 524 (494 SE2d 244) (1997). Rather, they operate in conjunction with a statute, such as the 9-1-1 Act, that imposes a legal duty but does not expressly provide a cause of action. See also Dupree v. Keller Indus., 199 Ga. App. 138, 141 (1) (404 SE2d 291) (1991). The Counties argue that the 9-1-1 Act imposes upon the providers a duty to bill and collect the 9-1-1 charges for all voice lines or pathways capable of reaching 9-1-1 call centers and to remit those fees to the Counties according to the terms of the statute (See OCGA § 46-5-134 (a) (1) (B) (telephone service providers “shall collect” 9-1-1 charges)), thus giving rise to their claims due to the providers’ alleged failure or refusal to do so. The duty to bill and collect the charges imposed by the 9-1-1 Act falls within the ambit of OCGA §§ 51-1-6 and 51-1-8, even though they arise from a statute that does not directly provide for a private cause of action. See, e.g., Pulte Home Corp. v. Simerly, 322 Ga. App. 699, 705-706 (3) (746 SE2d 173) (2013) (violations of Georgia Water Quality Control Act, Georgia Waste Control Act and Georgia Erosion and Sedimentation Control Act “fall within the ambit of OCGA § 51-1-6”); Dupree, supra at 141-142 (1) (violation of federal O SHA regulations are admissible as evidence of and give cause of action when in concert with OCGA § 51-1-6).
We do not agree with the Defendants’ argument that Best Jewelry Mfg. Co. v. Reed Elsevier, Inc., 334 Ga. App. 826 (780 SE2d 689) (2015) and U. S. Bank v. Phillips, 318 Ga. App. 819 (734 SE2d 799) (2012), require a different result. In Best Jewelry, supra, the plaintiff filed a class action, inter alia, on the grounds that the superior court’s e-filing system, as implemented, violated various statutes and regulations. Id. at 830 (1) (a) (i). This Court affirmed the *330 trial court’s grant of a motion to dismiss these claims, finding that the claims had no basis other than statutory violations and that the plaintiff failed to plead “facts sufficient to show violations” of the statutes. Id. at 830 (1)-834 (1) (b). In U. S. Bank, supra, this Court affirmed the trial court’s grant of a motion to dismiss the plaintiffs’ claim under OCGA § 51-1-6 for negligent implementation of the federal Home Affordable Modification Program because the homeowner/ plaintiff was not the intended third-party beneficiary to whom the defendant owed a legal duty Id. at 820. The cases relied upon by the amicus curiae briefs, Reilly v. Alcan Aluminum Corp., 272 Ga. 279, 280 (1) (528 SE2d 238) (2000) and Mattox v. Yellow Freight Systems, 243 Ga. App. 894, 895 (534 SE2d 561) (2000), are also distinguishable. Both of those cases involve specific prohibitions against liability, unlike this case.
Further, both OCGA §§ 51-1-6 and 51-1-8 were passed in 1863, prior to the passage of the 9-1-1 Act in 1977. Thus,
we must presume that the General Assembly had full knowledge of the existing state of the law and enacted the statute with reference to it. We construe statutes in connection and in harmony with the existing law, and as a part of a general and uniform system of jurisprudence, and their meaning and effect is to be determined in connection, not only with the common law and the constitution, but also with reference to other statutes and the decisions of the courts.
(Citations and punctuation omitted.) Chase v. State, 285 Ga. 693, 695-696 (2) (681 SE2d 116) (2009). See also Barbush v. Oiler, 158 Ga. App. 625, 625 (281 SE2d 359) (1981) (“Statutes are to be construed in connection and in harmony with existing law”) (citation and punctuation omitted). Thus, in enacting the 9-1-1 Act, the General Assembly would have been aware of the right of local governments to pursue claims under OCGA §§ 51-1-6 and 51-1-8 if the telephone companies did not properly collect these charges.
3. The Defendants argue that the trial court erred in concluding that the 9-1-1 charge imposed by the 9-1-1 Act is a “fee” rather than a “tax,” and contend that if the trial court had properly classified the charge as a tax, that it would have had no choice but to dismiss the Counties’ claim pursuant to our holding in Fulton County v. T-Mobile, South, 305 Ga. App. 466 (699 SE2d 802) (2010). In essence, the Defendants argue that if the charges at issue are taxes, that a common law action for the recovery of the taxes will not lie. Kirk v. Bray, 181 Ga. 814, 818 (184 SE 733) (1936). However, as we found in Division 2 herein, the Counties have statutory claims against the *331 Defendants pursuant to OCGA §§ 51-1-6 and 51-1-8 to enforce the duty imposed upon the Defendants by the 9-1-1 Act. And, even if we were to assume that such claims are really claims at common law, the Counties have complained that T-Mobile was wrongfully decided or inapplicable to the facts of this case. As explained below, we vacate the trial court’s decision on the issue of whether the 9-1-1 Act charges are a tax or a fee and remand for further consideration.
“Although it is often important to decide whether a particular charge is a tax or a fee, it is frequently difficult, to discern whether a given enactment provides for a regulatory fee or authorizes simply a tax.” Hadley v. City of Atlanta, 232 Ga. App. 871, 872 (1) (502 SE2d 784) (1998). The distinction between a tax and a fee “is not one of names but of substance.” Richmond County Bus. Assn. v. Richmond County, 224 Ga. 854, 856 (1) (165 SE2d 293) (1968). Our Supreme Court has defined a tax as “an enforced contribution exacted pursuant to legislative authority for the purpose of raising revenue to be used for public or governmental purposes, and not as payment for a special privilege or a service rendered.” (Citation and punctuation omitted.) McLeod v. Columbia County, 278 Ga. 242, 244 (2) (599 SE2d 152) (2004). A charge is generally not a tax if its purpose and objective is to compensate for services rendered. Id. Additional factors which distinguish a fee from a tax:
First, taxes are a means for the government to raise general revenue and usually are based on ability to pay (such as property or income) without regard to direct benefits which may inure to the payor or to the property taxed. Fees, on the other hand, are intended to be and should be clearly described as a charge for a particular service provided. Second, fees should apply based on the contribution to the problem. Third, fee payers, unlike tax payers, should receive some benefit from the service for which they are paying, although the benefits may be indirect or immeasurable.
(Citation and punctuation omitted.) Id. See also Unified Govt. of Athens-Clarke County v. Homewood Village, 292 Ga. 514, 515 (1) (739 SE2d 316) (2013). The last factor set forth in McLeod, supra — that fee payers, unlike tax payers, should receive some benefit from the service for which they are paying, although the benefits may be indirect or immeasurable — cannot be determined without further evidentiary proceedings.[11]
*332 The Defendants and the amicus curiae briefs argue that the trial court ignored binding precedent in T-Mobile, supra. In T-Mobile, supra, this Court held that the 9-1-1 charges collected in advance at the point of sale for prepaid wireless services were a tax because, inter alia, those upon whom the charge was imposed did not receive a special benefit not received by others, and the charge was for the purpose of raising general revenue. Id. at 470-471 (2).
However, we find that T-Mobile[12] is potentially distinguishable from the instant case because it involved a “taxpayer” seeking a refund for “taxes” that it mistakenly paid or was illegally required to pay, while in this case the Counties are not seeking to collect monies which were owed by the Defendants as “taxpayers” but to collect monies which the Defendants had a duty to collect for the Counties. Also, T-Mobile arguably is distinguishable from the instant case because the residents of the plaintiff Counties allegedly receive a special benefit not received by residents of other counties in Georgia or by persons simply passing through the Counties who call 9-1-1. The 9-1-1 Act grants autonomy to each local government to establish its own 9-1-1 services if it so chooses and the amount of fees to be imposed up to the $1.50 maximum set forth under the 9-1-1 Act. OCGA § 46-5-133 (a). The Counties argue that, although all members of the public with telephone service may access Georgia’s 9-1-1 systems, the citizens in Cobb and Gwinnett counties who incur the 9-1-1 charges receive enhanced 9-1-1 benefits and services. The Counties contend that the evidence in this case will
show that while some local governments provide no 911 services at all, Cobb and Gwinnett Counties provide enhanced landline 911 services that use special computer software to display the caller’s home address and location on a map. Residents may even have “Smart 911” services that allow them to pre-register their anticipated 911 needs for special circumstances, such as “senior with Alzheimer’s” or “child with disability.” Indeed, because different local governments offer different, 911 services, and none are authorized to accumulate more charges than their actual service costs, different, local governments charge different amounts for 911 services up to the statutory maximum of $1.50.
*333 If the evidence shows that these assertions are true, then, contrary to the conclusion in T-Mobile, supra, not all landline and wireless 9-1-1 services are created equal.
Because the analysis of whether the 9-1-1 Act charges are a tax or a fee, or whether T-Mobile was correctly decided in the first instance,[13] could be impacted by and/or turn on whether those upon whom the 9-1-1 charge is imposed receive a special benefit not received by others, there remain questions of fact that must be resolved by further evidentiary proceedings by the trial court. See, e.g., Covenant Media of Ga. v. City of Lawrenceville, 580 FSupp.2d 1313, 1315 (I) (N.D. Ga. 2008) (“In a case involving disputed facts, however, it may be necessary to provide an opportunity for discovery and a hearing that is appropriate to the nature of the motion to dismiss”) (citation and punctuation omitted). Accordingly, we vacate the trial court’s ruling on the motion to dismiss as to whether these charges are a “tax” or a “fee,” and we remand the issue for discovery and further evidentiary proceedings.

Judgment affirmed in part, reversed in part, and vacated in part, and case remanded.

Self, J., concurs fully and also concurs in Divisions 1 and 2 of the special concurrence. Dillard, P. J., con curs fully in Divisions 1 and 2, concurs in judgment only in Division 3, and also concurs specially.

 The United States Telecom Association and Incompas, as well as the Georgia Chamber of Commerce, have filed amicus curiae briefs in this case.

 When a customer “has several telephone access lines, each exchange access facility shall constitute a separate subscription.” OCGA § 46-5-122 (17). “Exchange access facility” is defined as ‘the access from a particular telephone subscriber’s premises to the telephone system” of a telephone company and includes, inter alia, service supplier-provided access lines, PBX trunks, Centrex network access registers, and Voice over Internet Protocol (“VoIP”) service suppliers and any other communication, message, signal, or information delivery system capable of initiating a 9-1-1 emergency call. OCGA § 46-5-122 (7).

 VoIP service is “any technology that permits a voice conversation using a voice connection to a computer... which sends a digital signal over the Internet through a broadband connection to be converted back to the human voice at a distant terminal!.]” OCGA § 46-5-122 (17.1).

 The trial court should not grant a motion to dismiss a complaint for failure to state a claim upon which relief may be granted unless:
(1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought. In deciding a motion to dismiss, all pleadings are to be construed most favorably to the party who filed them, and all doubts regarding such pleadings must be resolved in the filing party’s favor.
(Citations and punctuation omitted.) Best Jewelry Mfg. Co. v. Reed Elsevier, Inc., 334 Ga. App. 826, 826-827 (780 SE2d 689) (2015) (cert. denied).

 In their supplemental brief, the Counties argue that Section 14 (b) of the Senate Bill 222 from the 2017 legislative session indicates that the General Assembly intended to preserve an implied cause of action under the 9-1-1 Act. However, we fail to see how legislation passed 40 years after the 9-1-1 Act was enacted clarifies what the intent was of the original General Assembly which passed the Act, and in any event, Senate Bill 222 was vetoed by Georgia’s Governor and did not become law.

 See also OCGA § 48-13-59 (a), (b) (making it unlawful “for any innkeeper to fail, neglect, or refuse to collect the [hotel] tax,” and imposing a “penalty of being liable for and paying the tax himself” as well as a misdemeanor charge punishable by a fine or imprisonment if the statute is violated); OCGA § 48-13-124 (a), (b) (making it unlawful for any dealer to “knowingly and willfully fail, neglect, or refuse to collect the [energy tax] ” and imposing a penalty of “being liable for and paying the tax himself” as well as a “misdemeanor of a high and aggravated nature” punishable by a fine or imprisonment if the statute is violated).

 See OCGA § 46-5-134 (m) (2) (providing that the local government may be held liable to subscribers for pro rata reimbursement of funds not spent according to the 9-1-1 Act).

 At this time, we do not address whether and/or to what extent common law might also impose a duty upon the Counties that could be enforced under these statutes. The viability of these common law claims will more appropriately be tested pursuant to a motion for summary judgment after discovery. We refrain from ruling thereon until the “tax” versus “fee” issue is resolved, as discussed in Division 3 herein.

 OCGA § 51-1-6 states that “[w]hen the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby.”

 OCGA § 51-1-8 provides that “[pjrivate duties may arise from statute or from relations created by contract, express or implied. The violation of a private duty, accompanied by damage, shall give a right of action.”

 We note that the order appealed was pursuant to a motion to dismiss where no evidence was considered.

 While we do not endeavor herein to determine, the Counties contend that T-Mobile was wrongly decided. We defer consideration of such issue until after the trial court further considers the fee versus tax issue on remand.

 We note that because T-Mobile was an appeal on an order resolving a motion to dismiss, it likewise appears to have been decided without the benefit of evidence.