**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 21, 2018**

# In the Court of Appeals of Georgia

A18A0595. GEORGIA LOTTERY CORPORATION v. DO-021 TABLETOP MEDIA LLC.

DOYLE, Presiding Judge.

Tabletop Media, LLC, d/b/a Ziosk ("Tabletop") develops, produces, and distributes its Ziosk brand tabletop computer tablets, which it leases to restaurants. After the Georgia Lottery Corporation ("GLC") issued an executive order finding that the Ziosk was a coin-operated amusement machine ("COAM")[1] subject to licensing requirements and regulations of GLC pursuant to OCGA § 50-27-70, Tabletop filed a petition for judicial review in superior court. The superior court reversed GLC's decision, finding that the Ziosk was not a COAM, and this Court granted GLC's application for discretionary review. On appeal, GLC argues that the trial court erred

---

[1] See OCGA § 50-27-70 (b) (2) (A).

by: failing to give deference to GLC's interpretation of the relevant statute, OCGA § 50-27-70 (b) (2) (A); failing to consider the legislative history behind that Code section; and ultimately concluding that the Ziosk did not constitute a COAM subject to licensing and regulation by GLC. For the reasons that follow, we affirm.

The facts in this case are undisputed. The Ziosk is a seven-inch, Android-based touchscreen tablet that Tabletop sells or leases (along with accompanying customizable software and services) to restaurants, which place the tablets on tables and bars. The Ziosk is used for two purposes: (1) a restaurant management function, and (2) amusement. The restaurant management function, which is free for customers, permits customers to view nutritional information, place food and drink orders, summon a server, complete surveys, enroll or participate in loyalty or reward programs, view promotions and advertisements, scan coupons, pay for their meals, leave comments, and email or print a copy of their receipt. Customers can also use the Ziosk to play free games.[2] Customers can also, however, pay a one-time fee to access "premium entertainment," including videos, sports news, and unlimited games, which require the use of skill by the player. Revenue from the premium entertainment is split

---

[2] The free games do not require the insertion of a card or a coin to play.

between Tabletop and the restaurants; customers do not receive a reward or redemption when playing premium games.

On September 17, 2015, GLC issued a notice entitled "Tablets as Class A Coin Operated Amusement Machines" ("Notice") in response to a question from Ryan, LLC, regarding whether "tablets that are becoming more common in restaurants and retail establishments as a form of entertainment" are considered Class A COAMs subject to State COAM rules and laws. The Notice stated:

> each tablet offered to the public by a business that allows a customer to pay for access to games or music is considered a Class A COAM within the State of Georgia. Even if a tablet is not for the sole and exclusive purpose of playing games/music but allows it as an option, the tablet would still be a Class A COAM . . . [as defined by] OCGA § 50-27-70 (b) (3) and GLC Rule 13.1.2. . . .

> In other words, any tablet that a business uses to allow customers to pay to play games (that involve skill, including trivia) or music is subject to COAM laws and rules, including licensing requirements for the entity that owns the devices and the location in which the devices are used.

> If a location is offering Class A COAMs [i]n the form of tablets to its customers, such location must be licensed as a Class A COAM location[,] and the entity that owns such tablets must also be licensed as a Class A COAM master. Additionally, each Class A COAM placed in

3

a licensed location must have a valid Class A COAM permit sticker affixed to it [pursuant to] OCGA § 50-27-78 (b). Accordingly, a Class A COAM permit sticker should be purchased for each tablet made available to the public at the location.

On September 21, 2015, GLC sent a letter to Ryan, LLC, advising that the Android tablets addressed in Ryan's inquiry are considered COAMs by GLC pursuant to the Notice.[3]

Tabletop formally challenged the Notice, and following a hearing, GLC issued an executive order finding that the Ziosk was a COAM. After GLC denied Tabletop's motion for reconsideration and its motion for review,[4] Tabletop filed a petition for judicial review in superior court.[5]

The appeal to superior court was "confined to the record" and was decided by the court without a jury pursuant to OCGA § 50-27-76 (a). The parties agreed that the facts were not in dispute and that the issue was purely one of law. The superior court

---

[3] Ryan's letter is not contained in the appellate record.

[4] GLC's Chief Executive Officer did not issue an order on Tabletop's motion for review within 30 days, and therefore, the motion was deemed denied under GLC Rule 13.2.5 (1) (b) (4).

[5] "Appeal by an affected person from all actions of the corporation or chief executive officer shall be to the Superior Court of Fulton County. The review shall be conducted by the court and shall be confined to the record." See OCGA § 50-27-76 (a).

reversed GLC's decision, concluding that the Ziosk does not constitute a COAM under OCGA § 50-27-70 (b) (2) (A). This Court granted GLC's application for discretionary review, and this appeal followed.

1. GLC argues that the trial court erred by failing to give deference to the GLC's interpretation of the COAM statute. We disagree.

OCGA § 50-27-76 (b) provides the standard of review a superior court must apply when reviewing a decision by GLC:

> The court shall not substitute its judgment for that of [GLC] as to the weight of the evidence on questions of fact committed to the discretion of [GLC]. The court may affirm the decision of [GLC] in whole or in part; the court shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because [GLC's] findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority of [GLC];
>
> (3) Made upon unlawful procedures;
>
> (4) Affected by other error of law;
>
> (5) Not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

5

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

This Code section is "essentially identical" to the standard of review provided in the Administrative Procedure Act.[6] Thus, although GLC is "an instrumentality of the [S]tate, and not a [S]tate agency,"[7] we conclude that the trial court properly applied the standard of review applicable to administrative decisions.

In *Handel v. Powell*,[8] the Supreme Court of Georgia applied this same standard of review to a decision by the Secretary of State on the Secretary's challenge to a candidate's qualifications.[9] The same rationale applies to the instant case. Thus, consistent with the Supreme Court's decision in *Handel*, we hold that when reviewing a decision of the GLC or its CEO,

> [the superior court] must accept [GLC's] findings of fact if there is any evidence to support the findings[. T]he court must first determine if there is evidence to support the factual findings; the court then is

---

[6] See OCGA § 50-13-19 (h).

[7] *Kyle v. Ga. Lottery Corp.*, 290 Ga. 87, 91 (1) (718 SE2d 801) (2011), citing OCGA § 50-27-4.

[8] 284 Ga. 550 (670 SE2d 62) (2008).

[9] See id. at 552, citing *Pruitt Corp. v. Ga. Dept. of Community Health*, 284 Ga. 550 (670 SE2d 62) (2008).

statutorily required to examine the soundness of the conclusions of law drawn from the findings of fact supported by any evidence.[10]

In this case, as in *Handel*, the facts are undisputed, and the trial court confined its review to the soundness of GLC's legal conclusions. As the Supreme Court explained:

> While judicial deference is afforded an agency's interpretation of statutes it is charged with enforcing or administering, the agency's interpretation is not binding on the courts, which have the ultimate authority to construe statutes. It is the role of the judicial branch to interpret the statutes enacted by the legislative branch and enforced by the executive branch), and administrative rulings will be adopted only when they conform to the meaning which the court deems should properly be given. The judicial branch makes an independent determination as to whether the interpretation of the administrative agency correctly reflects the plain language of the statute and comports with the legislative intent.[11]

---

[10] (Punctuation omitted.) *Handel*, 284 Ga. at 552.

[11] (Citations and punctuation omitted.) Id. at 553, citing *Harbuck v. State*, 280 Ga. 775 (3) (631 SE2d 351) (2006), *McKee v. City of Geneva*, 280 Ga. 411, 413 (627 SE2d 555) (2006), and *Sawnee EMC v. Ga. Public Svc. Comm.*, 273 Ga. 702, 706 (544 SE2d 158) (2001).

As the superior court properly concluded in this case, this same rationale applies to a superior court's review of a GLC decision. Accordingly, this enumeration presents no basis for reversal.

2. GLC argues that the superior court erred by concluding that the Ziosk was not a COAM as defined by OCGA § 50-27-70 (b) (2) (A). The issue before the superior court was whether GLC's decision violated the plain language of the statute; exceeded its statutory authority; or constituted an abuse of discretion by misapplying the statute. We find no basis for reversal.

Our analysis of the proper interpretation of OCGA § 50-27-70 (b) (2) (A) is guided by the following principles:

> A statute draws its meaning, of course, from its text. Under our well-established rules of statutory construction, we presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its "plain and ordinary meaning," we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. Though we may review the text of the provision in question and its context within the larger legal framework to discern the intent of the legislature in enacting

8

it, *where the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning ends.*[12]

(a) Tabletop argues that the COAM statute must be construed strictly and against GLC because (a) COAM laws authorize GLC to impose fines and fees for noncompliance,[13] and statutes that impose fees and fines are construed narrowly against State actors[14]; (b) COAM manufacturers must obtain a license,[15] and licensing statutes are construed strictly against the government as an interference with the

---

[12] (Citations and punctuation omitted; emphasis supplied.) *Patton v. Vanterpool*, 302 Ga. 253, 254 (806 SE2d 493) (2017), quoting *Deal v. Coleman*, 294 Ga. 170, 172-173 (751 SE2d 337) (2013).

[13] See OCGA § 50-27-71 (n) ("Failure to obtain a license as required by this Code section shall subject the person to a fine of up to $25,000[] and repayment of all fees or receipts due to the corporation pursuant to this article. . . "); OCGA § 50-27-82 (a) ("If any owner or operator of any bona fide [COAM] in this state shall violate any provision of this article or any rule and regulation promulgated under this article, [GLC] corporation may investigate the violation and may seek sanctions, including late fees. . . . ").

[14] See *State Ethics Commr. v. Moore*, 214 Ga. App. 236, 237-238 (447 SE2d 687) (1994) ("[W]hen a statute imposes a fine or penalty, strict construction is required in favor of the person penalized. The applicable rule of statutory construction is that forfeitures and penalties are not favored and statutes relating to them must be strictly construed, and in a manner as favorable to the person against whom the forfeiture or penalty would be exacted as is consistent with fair principles of interpretation.") (punctuation omitted).

[15] See OCGA § 50-27-71 (a) (4).

9

operation of business[16]; (c) violations of COAM laws can constitute a misdemeanor,[17] and criminal statutes are construed strictly against the State[18]; and (d) COAM laws were enacted to "safeguard the fiscal soundness of the [S]tate, enhance public welfare, and support the need to educate Georgia's children through the HOPE scholarship program and pre-kindergarten funding;"[19] and laws that raise revenue are construed against the State.[20]

GLC, on the other hand, argues that the COAM laws should be construed liberally in its favor because the laws are remedial in nature, citing OCGA § 50-27-70 (a), which states that the legislature enacted the COAM laws "to prevent the unregulated operation of [COAMs], . . . which will aid in the enforcement of the tax obligations that arise from the operation of [COAMS] as well as prevent unauthorized cash payouts."

---

[16] See *Mayor of Savannah v. Savannah Elec. & Power Co.*, 205 Ga. 429, 435 (54 SE2d 260) (1949).

[17] See OCGA § 50-27-82.

[18] See *Frix v. State*, 298 Ga. App. 538, 542 (1) (680 SE2d 582) (2009).

[19] OCGA § 50-27-70 (a).

[20] See *Thompson v. Ga. Power Co.*, 73 Ga. App. 587, 597 (37 SE2d 622) (1946).

The COAM statutes are not remedial.[21] "[L]aws which affect the remedy only are remedial statutes, which are laws curing defects in the remedy, or confirming rights already existing, or adding to the means of securing and enforcing the same. . . A remedial statute has also been defined as one remedying defects in the common law."[22] Although they do provide procedural safeguards to aid in tax collection associated with COAMs and to prevent unauthorized cash payouts, the regulation of COAMs is, as Tabletop argues, a licensing scheme intended to raise revenue "to safeguard the fiscal soundness of the [S]tate, enhance public welfare, and support the need to educate Georgia's children through the HOPE scholarship program and pre-kindergarten funding."[23] And "[r]evenue laws are neither remedial statutes nor laws founded upon any permanent public policy . . . and are not, therefore, to be

---

[21] Compare *Williams Gen. Corp. v. Stone*, 280 Ga. 631, 632 (1) (632 SE2d 376) (2006) (holding that the Georgia RICO Act should be "liberally construed" to effectuate its remedial purpose of providing compensation to private persons injured or aggrieved by reason of any RICO violation), citing OCGA § 16-14-2 (b).

[22] (Citation and punctuation omitted.) *Glover v. Colbert*, 210 Ga. App. 666, 668 (437 SE2d 363) (1993), citing Black's Law Dictionary Revised 4th Ed., p. 1457 (1968).

[23] OCGA § 50-27-70 (a).

liberally construed; and whenever there is a just doubt, that doubt should absolve the taxpayer from his burden."[24]

(b) We now turn to the statute itself. OCGA § 50-27-70 (b) (2) (A) defines a COAM as

> every machine of any kind or character used by the public to provide amusement or entertainment whose operation requires the payment of or the insertion of a coin, bill, other money, token, ticket, card, or similar object and the result of whose operation depends in whole or in part upon the skill of the player, whether or not it affords an award to a successful player pursuant to subsections (b) through (g) of Code Section 16-12-35, and which can be legally shipped interstate according to federal law.[25]

The statute divides COAMs into two categories: Class A machines and Class B machines.[26] GLC concluded that the Ziosk tablet was a Class A machine, which

> does not allow a successful player to carry over points won on one play to a subsequent play or plays, and: (A) Provides no reward to a successful player; (B) Rewards a successful player only with free

---

[24] *Thompson*, 73 Ga. App. at 597.

[25] OCGA § 50-27-70 (b) (2) (A) & (b) (2) (B) respectively provide non-exhaustive examples of both COAM machines and those machines and other devices that do not constitute COAMs.

[26] See OCGA § 50-27-70 (b) (3) & (b) (4).

replays or additional time to play; (C) Rewards a successful player with noncash merchandise, prizes, toys, gift certificates, or novelties in compliance with the provisions of subsection (c) or paragraph (1) of subsection (d) of Code Section 16-12-35, and does not reward a successful player with any item prohibited as a reward in subsection (i) of Code Section 16-12-35 or any reward redeemable as an item prohibited as a reward in subsection (i) of Code Section 16-12-35; (D) Rewards a successful player with points, tokens, tickets, or other evidence of winnings that may be exchanged only for items listed in subparagraph (C) of this paragraph; or (E) Rewards a successful player with any combination of items listed in subparagraphs (B), (C), and (D) of this paragraph.[27]

Although the parties disagree as to the application of OCGA § 50-27-70 (b) (2) (A) to the Ziosk tablet, both agree that it is unambiguous, as did the superior court. We agree.

It is undisputed that the Ziosk is used by the public and can be shipped interstate legally according to federal law. The premium component of the machines

---

[27] OCGA § 50-27-70 (b) (3). By contrast, a Class B COAM "allows a successful player to accrue points on the machine and carry over points won on one play to a subsequent play or plays in accordance with paragraph (2) of subsection (d) of Code Section 16-12-35 and: (A) Rewards a successful player in compliance with the provisions of paragraphs (1) and (2) of subsection (d) of Code Section 16-12-35; and (B) Does not reward a successful player with any item prohibited as a reward in subsection (i) of Code Section 16-12-35 or any reward redeemable as an item prohibited as a reward in subsection (i) of Code Section 16-12-35." OCGA § 50-27-70 (b) (4).

13

requires payment, and the operation of the premium component depends in part or in whole on the skill of the player. However, a user can use the Ziosk, without payment, for other purposes, including to access nutritional information, order, pay, and play certain other games. Therefore, as the superior court concluded, "the operation" of the Ziosk tablet does not *require* payment, and users can operate the tablet without exercising any skill. Thus, the trial court properly concluded that the Ziosk tablet is not a COAM as defined by OCGA § 50-27-70 (2) (A).

3. Finally, GLC argues that the superior court's conclusion that the Ziosk tablet is not a COAM is inconsistent with the legislature's intent. But as we discussed in Division 2, if "statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning ends."[28] As the Supreme Court of Georgia has stated, "courts cannot construe statutes to force an outcome that the legislature did not expressly authorize."[29] If the legislature intends to include as

---

[28] (Punctuation omitted.) *Patton*, 302 Ga. at 254.

[29] (Punctuation omitted.) Id. at 258, n.9, quoting *Turner v. Ga. River Network*, 297 Ga. 306, 308 (773 SE2d 706) (2015).

COAMs those devices and machines whose operation depend *in part* on the payment

of money and the exercise of skill, "the General Assembly will need to act."[30]

*Judgment affirmed. Mercier, J., concurs. Dillard, C. J., concurs fully and specially.*

---

[30] *Patton*, 302 Ga. at 258, n.9.

A18A0595.     GEORGIA     LOTTERY     CORPORATION     v.

     TABLETOP MEDIA, LLC.


     DILLARD, Chief Judge, concurring fully and specially.

     I concur fully in Presiding Judge Doyle's thoughtful and well-reasoned

majority opinion. I write separately to encourage the parties who appear before us to

stop referencing altogether the ethereal fiction of "legislative intent" in the context

of statutory interpretation.[1] As a judge, I do not give a wit about what some legislator

intended but did not expressly provide for in the statutory text.[2] If the General

---

[1] *See generally BellSouth Telecommunications, LLC v. Cobb County*, 342 Ga. App. 323, 334-35 n. 3 (802 SE2d 686) (2017) (Dillard, P.J., concurring fully and specially).

[2] *See King v. Burwell*, ___ U. S. ___ (135 SCt 2480, 2505 (V), 192 LEd2d 483) (2015) (Scalia, J., dissenting) ("More importantly, the Court forgets that ours is a government of laws and not of men. That means we are governed by the terms of our laws, not by the unenacted will of our lawmakers.").

Assembly "enacted into law something different from what it intended, then it should amend the statute to conform to its intent."[3] Thus, so long as the meaning of the relevant statutory text is plain and does not lead to an absurd result, that is the end of our inquiry.[4] Indeed, it is deeply troubling when

---

[3] *Id*. (punctuation and citation omitted); *accord Lamie v. U.S. Trustee*, 540 U. S. 526, 542 (III) (124 SCt 1023, 157 LEd2d 1024) (2004); *see Murphy v. Nat'l Collegiate Athletic Ass'n*, ___ U. S. ___ (138 SCt 1461, 1487, 200 LEd2d 854) (2018) (Thomas, J., concurring) ("More fundamentally, even if courts could discern Congress' hypothetical intentions, intentions do not count unless they are enshrined in a text that makes it through the constitutional processes of bicameralism and presentment."); *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U. S. 81, 119 (II) (127 SCt 1534, 167 LEd2d 449) (2007) (Scalia, J., dissenting) (noting that because we have "a Government of laws, not of men," we are governed by "legislated text," not "legislators' intentions"); *Malphurs v. State*, 336 Ga. App. 867, 870-71 (785 SE2d 414) (2016) (Peterson, J.) ("The General Assembly does not enact a general intention; it enacts statutes. Statutes have words, and words have meanings. It is those meanings that we interpret and apply, not some amorphous general intention.").

[4] *See Shorter Coll. v. Baptist Convention of Ga.*, 279 Ga. 466, 470 (1) (614 SE2d 37) (2005); *Ray v. Barber*, 273 Ga. 856, 856 (1) (548 SE2d 283) (2001); *see also I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 452–53 (107 SCt 1207, 94 LEd2d 434) (1987) (Scalia, J., concurring) ("Judges interpret laws rather than reconstruct legislators' intentions. Where the language of those laws is clear, we are not free to replace it with an unenacted legislative intent."); *City of Atlanta v. Miller*, 256 Ga. App. 819, 820 (1) (569 SE2d 907) (2002) ("In construing a legislative act, a court must first look to the literal meaning of the act. If the language is plain and does not lead to any absurd or impracticable consequences, the court simply construes it according to its terms and conducts *no further inquiry*." (cleaned up)); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 397 (1st ed. 2012) ("Intentionalist theorists and courts promote the idea that enacted texts merely evoke or suggest—as opposed to state—what the true law is . . . . If this were true, then it would hardly be possible ever to reach a consensus about the law. The traditional view is that an enacted text is itself the law."); *id*.

2

judges start discussing not the meaning of the statutes the legislature actually enacted, as determined from the text of those laws, but rather the unexpressed "spirit" or "reason" of the legislation, and the need to make sure the law does not cause "unreasonable consequences," [thus venturing] into dangerously undemocratic, unfair, and impractical territory. The "spirit or reason" approach to statutory interpretation invites judges to read their own policy preferences into the law, as we all believe that our own policy preferences are wise and reasonable, which tempts us to assume, consciously or unconsciously, that the legislature could not have intended differently.[5]

As Georgians (and Americans), we are "governed by laws, not by the intentions of legislators."[6] And as judges, we should only be concerned with what laws actually

---

at 376 ("[T]hat the legislature even *had* a view on the matter at issue . . . is pure fantasy. In the ordinary case, most legislators could not possibly have focused on the narrow point before the court [and] the few who did undoubtedly had varying views.").

[5] *Merritt v. State*, 286 Ga. 650, 656 (690 SE2d 835) (2010) (Nahmias, J., concurring specially) (punctuation omitted); *accord Callaway Blue Springs, LLLP v. W. Basin Capital, LLC*, 341 Ga. App. 535, 541 (1) (801 SE2d 325) (2017); *see also* Christopher J. Scalia and Ed Whelan, *Scalia Speaks: Reflections on Law, Faith, and Life Well Lived*, 236 (Crown Forum 2017) ("[W]e are, as the Constitution of Massachusetts describes it, a government of laws, not of men—which means government by legislated text, not by legislators' intentions").

[6] *Conroy v. Aniskoff*, 507 U.S. 511, 519 (113 SCt 1562, 123 LE2d 229) (1993) (Scalia, J., concurring); *accord Callaway Blue Springs, LLLP*, 341 Ga. App. at 541 (1); *Day v. Floyd County Bd. of Educ.*, 333 Ga. App. 144, 151 (775 SE2d 622) (2015) (Dillard, J., concurring).

say, "not by what the people who drafted the laws intended."[7] Let us put to rest, then, the fanciful notion that judges are somehow able to discern the collective intent of a legislative body.[8] Judges are not in the business of divining unexpressed legislative intent, nor are we capable of doing so with any reasonable degree of accuracy. As Judge Bethel (a former legislator) has aptly noted, "[a]ny attempt to discern legislative intent beyond the express language passed by a legislative body is as practical and productive as attempting to nail Jello to the wall."[9] I agree. Judges are trained to interpret the meaning of the words expressly ratified by the people or enacted by their representatives in a manner consistent with longstanding canons of construction. Thus, when judges speak as if they are engaging in some mystical search for the legislature's unexpressed intent, they create an impression that is both misleading and squarely at odds with the judicial duty. It is time to state plainly what

---

[7] SCALIA & GARNER, *supra* note 4, at 375; *accord Callaway Blue Springs, LLLP*, 341 Ga. App. at 541 (1); *Day*, 333 Ga. App. at 151 (Dillard, J., concurring).

[8] *See In re Whittle*, 339 Ga. App. 83, 85-86 (1) (793 SE2d 123) (2016) ("[I]n the context of legislation, discerning 'collective intent is pure fiction because dozens if not hundreds of legislators have their own subjective views on the minutiae of bills they are voting on—or perhaps no views at all because they are wholly unaware of the minutiae.'") (citation omitted).

[9] *Bishop v. State*, 341 Ga. App. 590, 593 (802 SE2d 39) (2017) (Bethel, J., concurring).

4

is already manifestly true: What legislators intend but do not expressly provide for in the text of a statute is meaningless.

I realize, of course, that OCGA § 1-3-1 (a) provides that "[i]n all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy," but this statutory directive—which, in my view, is constitutionally dubious—must be read in conjunction with OCGA § 1-3-1 (b), which provides that "[i]n all interpretations of statutes, the ordinary signification shall be applied to all words . . . ." In any event, the General Assembly can no more tell the judiciary how to *generally* interpret the law than we can direct them how to legislate. The separation of powers is essential to the maintenance of our constitutional republic, and it is high time that any discussion of statutory interpretation between the bench and bar reflect the reality of our jurisprudence and acknowledge the strict demarcation line between judicial interpretation and legislating. We are judges, not black-robed philosopher kings.