**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**January 23, 2023**

# In the Court of Appeals of Georgia

A22A1589. IRISH ANGELA FREY, et al v. MICHAEL C. JESPERSON et al.

DILLARD, Presiding Judge.

This case arises from a personal-injury and wrongful-death action brought by Irish Frey—individually and as administrator of the estate of her late husband, William Frey—against Michael Jesperson after an automobile accident involving William and Jesperson, resulting in William's death. And now, Irish appeals the trial court's grant of summary judgment to Liberty Mutual Fire Insurance Company regarding a dispute over the amount of uninsured motorist ("UM") coverage provided for under an insurance policy it issued to William. Specifically, Irish argues the trial court erred in finding that (1) certain language in the cover letter accompanying the UM coverage selection form did not coerce William into selecting a lower limit of

UM coverage (*i.e.*, "reduced-by coverage") or discourage him from selecting a higher limit of coverage (*i.e.*, "add-on coverage");[1] (2) language in the cover letter indicating that William could select a different type of UM coverage than was pre-selected on the form by calling Liberty Mutual provided him with a meaningful opportunity to do so; (3) William's submission of the form after the required deadline operated as a new agreement between the parties; and (4) William knowingly and voluntarily selected reduced-by coverage. For the reasons set forth *infra*, we affirm.

Viewing the evidence in the light most favorable to Irish (*i.e.*, the nonmoving party),[2] the record shows that on June 4, 2017, William—who was driving a motorcycle—crashed into a truck driven by Jesperson when Jesperson took a left turn into the path of a funeral procession. William tragically died as a result of the injuries he sustained in the accident. And thereafter, Irish filed a personal-injury and wrongful-death action against Jesperson. Then, following trial, the jury found that

---

[1] The difference between reduced-by and add-on UM coverage is explained in greater detail *infra*. In the insurance policy at issue, these options for coverage are referred to as "Reduced Coverage" and "Added On Coverage." For the sake of clarity and consistency with Georgia caselaw, we refer to these options throughout the opinion as "add-on" and "reduced-by" coverage, except when quoting the policy.

[2] *See, e.g., Martin v. Herrington Mill, LP*, 316 Ga. App. 696, 696 (730 SE2d 164) (2012).

Jesperson caused the accident and awarded Irish $1,655,647 in damages. Relevant here, the judgment was "only enforceable against any remaining liability insurance and/or underinsured motorist coverage which provid[ed] coverage for the claims contained within [the] case."

At the time of the accident, William was covered by an insurance policy with Liberty Mutual and two policies with Progressive Insurance Company. The Liberty Mutual policy was secondary to the Progressive policies ; and each of the Progressive policies provided for $25,000 in UM coverage. As a result, Progressive paid Irish a total of $50,000 in UM benefits under those policies. Liberty Mutual also paid Irish $50,000 in UM benefits under its policy, and on or about May 18, 2018, Irish "negotiated and endorsed" that check.

During the course of litigation, Liberty Mutual filed a motion for summary judgment, seeking to establish that William was only entitled to $50,000 in UM benefits under his policy. Specifically, Liberty Mutual argued that, although William's policy provided for $100,000 in UM coverage, he selected reduced-by coverage in executing the policy, which meant the full amount was reduced by the $50,000 in UM coverage Progressive paid Irish. Irish opposed the motion, arguing that, due to certain statements in the UM coverage selection form and accompanying

cover letter, as well as the fact that William did not return the form by the required deadline, he was entitled to the "broadest [UM] coverage available"—which she claimed was $250,000 add-on coverage. And under such circumstances, Irish contended the amount of coverage provided for in the policy should not be reduced by the $50,000 Progressive paid under its policies. Ultimately, the trial court granted Liberty Mutual's motion, and this appeal follows.

Summary judgment is, of course, proper when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."[3] Furthermore, a *de novo* standard of review applies to an appeal from a grant or denial of summary judgment, and we "view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant."[4] Moreover, at the summary-judgment stage, "[w]e do not resolve disputed facts, reconcile the issues, weigh the evidence, or determine its credibility, as those matters must be submitted to a jury for resolution."[5] With these guiding principles in mind, we turn to the case at hand.

---

[3] OCGA § 9-11-56 (c); *accord Martin*, 316 Ga. App. at 697.

[4] *Martin*, 316 Ga. App. at 697 (punctuation omitted).

[5] *Tookes v. Murray*, 297 Ga. App. 765, 766 (678 SE2d 209) (2009).

To understand the parties' dispute over the amount of UM coverage provided for under William's Liberty Mutual policy, "it is necessary to briefly examine the evolution of Georgia's UM statute, OCGA § 33-7-11."[6] Among other things, the UM statute requires insurers to "provide UM coverage in automobile insurance policies unless the insured rejects the coverage in writing."[7] And in 2008, the General Assembly amended the UM statute to "offer two different types of UM coverage."[8] Importantly, prior to that amendment, all UM policies offered in Georgia were reduced-by policies, "under which the UM limits of liability were reduced by any amount that the insured received from the tortfeasor's insurer."[9] But the 2008 amendment introduced the option of add-on UM coverage, which provides that "the applicable limits of liability are available to cover any damages an insured suffers which exceed the tortfeasor's policy limits."[10] The amendment also mandated that

---

[6] *Cline v. Allstate Prop. & Cas. Ins.*, 354 Ga. App. 415, 416 (841 SE2d 63) (2020).

[7] *Id.*; *see* OCGA § 33-7-11 (a) (1), (3).

[8] *Cline*, 354 Ga. App. at 416; *see* Ga. L. 2008, p. 1192, § 1 (effective January 1, 2009).

[9] *Cline*, 354 Ga. App. at 416-17 (punctuation omitted).

[10] *Id.* at 417 (punctuation omitted); *see* OCGA § 33-7-11(b) (1) (D) (ii) (I).

5

UM policies include add-on coverage by default, "unless the insured requested [reduced-by] coverage in writing."[11] And insureds who elect the reduced-by coverage "generally pay a lower premium than that charged for excess or [add-on] UM coverage."[12] With the foregoing in mind, we turn to the specific policy at issue.

In 2004, William secured a car insurance policy with Liberty Mutual, which was to be effective from August 23, 2004, through August 23, 2005. Subsequently, he renewed the policy each year such that it was still in effect at the time of his death in 2017. When he renewed this policy in 2009, William elected to forego any UM coverage under the policy. But in July 2009, he modified his policy by executing a "Georgia Option Form" ("UM selection form"), which gave him the option to select reduced-by UM coverage, add-on UM coverage, or no UM coverage. And on the form (which William signed, dated, and returned to Liberty Mutual), he selected reduced-by coverage in the amount of $100,000 per person for bodily injuries.[13]

---

[11] *Cline*, 354 Ga. App. at 417; *see* OCGA § 33-7-11 (b) (1) (D) (ii) (II).

[12] *Allstate Fire & Cas. Ins. Co. v. Rothman*, 332 Ga. App. 670, 672 (774 SE2d 735) (2015).

[13] William also selected $300,000 reduced-by UM coverage per accident and $50,000 reduced-by UM coverage for property damage. Those selections are not at issue in this appeal.

In this regard, the UM selection form explained,

> Reduced Coverage will only pay up to the *difference between the at-fault driver's Liability Coverage and your Reduced Coverage*. This means Reduced Coverage will allow you to collect from the at-fault driver and your Reduced Coverage combined, up to the same limit of Reduced Coverage you have purchased.[14]

Then, when William renewed the policy in 2013, he signed an updated UM selection form, in which he *again* selected reduced-by UM coverage of $100,000 per bodily injury. But this time, the form provided a more detailed explanation regarding the difference between reduced-by and add-on coverage. Specifically, the form explained that add-on coverage required a higher premium, but would "pay for your damages *in addition to* the at-fault driver's [l]iability coverage limit, up to your Added On Coverage Limit."[15] The form further informed William that

> [i]f [he] rejected the Added On Coverage, [he] may select [UM] Coverage Reduced By At-Fault Limits Coverage . . . . Reduced Coverage provides less protection than Added On Coverage, but Reduced Coverage is available at a lower cost. Unlike Added On Coverage that provides up to [the] full limit of protection over and above the at-fault driver's liability coverage, Reduced Coverage will

---

[14] (Emphasis supplied).

[15] (Emphasis supplied).

7

only pay up to the difference between the at-fault driver's [l]iability [c]overage and your Reduced Coverage.

In signing the form, William confirmed that he understood Liberty Mutual's explanation of UM coverage.

Although reduced-by coverage was pre-selected on the form by Liberty Mutual, the cover letter accompanying it stated, "*[i]f you would like to select [ ] different coverage than is currently being afforded, please contact Liberty Mutual using the number provided below.*"[16] It is undisputed that William never contacted Liberty Mutual to select different coverage than was marked on the form. The cover letter also provided another detailed explanation of the difference between reduced-by and add-on UM coverage, as well as a hypothetical scenario to illustrate same. As previously noted, William renewed the policy, which provided for reduced-by UM coverage in the amount of $100,000 for bodily injuries, each year from July 2009 until the time of his death in 2017.[17]

---

[16] (Emphasis in original).

[17] William was not required to execute and submit an updated UM coverage selection form after he made his 2009 or 2013 selections. Indeed, in compliance with Georgia law, the form explained that his UM coverage selection would apply to any renewals of the policy unless he informed Liberty Mutual of his desire to change it in writing. *See* OCGA § 33-7-11 (a) (3) ("The amount of [UM] coverage need not be

8

1. Irish first argues the trial court erred by finding that certain language on the cover letter accompanying the UM coverage selection form—which limited what could be written on it—did not discourage William from selecting add-on coverage or coerce him into choosing reduced-by coverage, which had been pre-selected on the form by Liberty Mutual. We disagree.

Here, the record reflects that in 2013, when William renewed the insurance policy at issue, Liberty Mutual provided him with an option to select (in writing) the reduced-by UM coverage he had maintained since 2009, add-on UM coverage, or decline such coverage. In this regard, the cover letter accompanying the UM selection form explained:

> a. The limit selected on the enclosed form represents the limit currently being afforded on your auto policy.

> b. If you would like to maintain your current coverage, please sign, date, and return the form by 2/27/2013 . . . .

---

increased from the amounts shown on the declarations page on renewal once coverage is issued."). *Cf. Gov't. Emps. Ins. Co. v. Morgan*, 341 Ga. App. 396, 400 (1) (a) (800 SE2d 612) (2017) ("[O]nce an insured has exercised the option to reject [UM] coverage, the insurer is under no further duty or obligation to offer the coverage, absent a request, for the life of the policy.").

9

c. *If you would like to select different coverage than is currently being afforded, please contact Liberty Mutual Insurance using the number provided below.*[18]

As to the option for William to maintain reduced-by coverage by signing, dating, and returning the form, the cover letter instructed that "[t]he only markings permitted on the form are your signature and date. Additional markings may invalidate the coverage selection."

Irish now contends the foregoing language limiting what William could write on the form discouraged him from selecting add-on UM coverage and coerced him into maintaining his reduced-by selection. But contrary to Irish's argument, the cover letter indicated that those limitations *only* apply *if* William wanted to "maintain [his] current coverage." And it is undisputed that William *did* select to keep his reduced-by UM coverage by signing, dating, and returning the option form to Liberty Mutual as instructed. Significantly, the cover letter *and* UM selection form explained the difference between reduced-by and add-on coverage, even providing a hypothetical scenario to further clarify that difference. And in signing the form, William represented that he understood Liberty Mutual's explanation of coverage. Moreover,

---

[18] (Emphasis in original).

10

Irish has provided no evidence William was *coerced* into making that selection. Indeed, the option form emphasized *in bold lettering* that William could select a different kind of coverage simply by making a phone call, which he never did.

Even so, Irish summarily asserts that the language in the cover letter precluded William's ability to change his UM coverage on the form, "even though there were blanks . . . ," and "cannot be what our legislature had in mind when it declared that the terms and amount of coverage were to be '*at the option of the insured*.'" Irish also argues, again without citing any legal authority, that "[p]lacing the burden on [William] to request a change in the coverage Liberty [Mutual] selected is not equivalent to the option required by statute." But these are merely Irish's personal opinions about what the UM statute should require and prohibit, and she cites no *language* in the statute prohibiting an insurance company from "burdening" an insured with a *phone call* to obtain add-on UM coverage. Additionally, and importantly, whatever the numerous legislators' personal understandings of (or aspirations for) the UM statute may have been at the time of enactment are ultimately of no consequence. This Court's only concern is with the plain meaning of the

11

statutes at issue, which is rightfully our *sole* focus in determining the General Assembly's collective "intent."[19]

In sum, because the UM option form and accompanying cover letter unambiguously explained the difference between reduced-by and add-on UM

---

[19] *See Merritt v. State*, 286 Ga. 650, 656 (690 SE2d 835) (2010) (Nahmias, J., concurring specially) ("[W]hen judges start discussing not the meaning of the statutes the legislature actually enacted, as determined from the text of those laws, but rather the unexpressed 'spirit' or 'reason' of the legislation, and the need to make sure the law does not cause 'unreasonable consequences,' [thus venturing] into dangerously undemocratic, unfair, and impractical territory."); *Beasley v. Ga. Dep't of Corr.*, 360 Ga. App. 33, 41 (3) (a) (861 SE2d 106) (2021) ("Appellate courts must discern the 'intent' of the legislature through the words contained in enacted statutes, and nothing more."); *Monumedia II, LLC v. Dep't of Transp.*, 343 Ga. App. 49, 55 (1) (806 SE2d 215) (2017) ("[W]e are charged with interpreting the law in accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies), as well as with faithfully following the precedents established by higher courts." (footnotes & punctuation omitted))); *Bellsouth Telecomm., LLC v. Cobb Cnty.*, 342 Ga. App. 323, 335 n.16 (802 SE2d 686) (2017), *vacated on other grounds by Bellsouth Telecommunications, LLC v. Cobb Cnty.*, 352 Ga. App. 110 (834 SE2d 124) (2019) (Dillard, J., concurring fully and specially) ("In my view, our appellate courts should stop referencing altogether the ethereal fiction of 'legislative intent' in the context of statutory interpretation. A judge should not care about what any legislator intended but did not expressly provide for in the statutory text."); *see also Richardson v. State*, 276 Ga. 639, 640 (1) (581 SE2d 528) (2003) ("Courts of last resort must frequently construe the language of a statute, but such courts may not substitute by judicial interpretation language of their own for the clear, unambiguous language of the statute, so as to change the meaning." (punctuation omitted)); *In re Whittle*, 339 Ga. App. 83, 88 (1) (793 SE2d 123) (2016) (noting that if an appellant's policy arguments are ultimately to prevail, they should be made to our General Assembly, not an appellate court).

coverage and provided William with detailed instructions on how to make his selection between the two, Irish cannot show he was coerced into selecting reduced-by coverage—the same type of insurance he had maintained since 2009. And it is undisputed William followed the simple instructions necessary to maintain his reduced-by UM coverage by signing, dating, and returning the form, rather than calling Liberty Mutual to select add-on coverage instead. As a result, at the time of his accident, William only maintained reduced-by UM coverage. Suffice it to say, unambiguous terms in an insurance policy require no construction, and "their plain meaning will be given full effect, regardless of whether they might be of benefit to the insurer, or be of detriment to an insured."[20]

2. Irish also maintains that requiring William to call Liberty Mutual to make a different UM coverage selection than he was currently being afforded did not provide him with a "meaningful opportunity" to do so. And while Irish asserts this allegation as a separate claim of error, we have already considered and rejected it in

---

[20] *Auto-Owners Ins. Co. v. Neisler*, 334 Ga. App. 284, 286 (1) (779 SE2d 55) (2015) (punctuation omitted); *see Turner v. Gateway Ins. Co.*, 290 Ga. App. 737, 739 (660 SE2d 484) (2008) ("Courts have no more right by strained construction to make an insurance policy more beneficial by extending the coverage contracted for than they would have to increase the amount of coverage." (punctuation omitted)).

13

Division 1 *supra.* In any event, Irish provides no legal authority to support her one paragraph argument in support of this claim of error, and so she has abandoned it.[21]

3. Next, Irish claims the trial court erred in finding that, when Liberty Mutual received William's UM option form after the required deadline, Liberty Mutual's receipt of the form operated as a new agreement between the parties. This argument is a nonstarter.

As detailed above, the cover letter accompanying the UM selection form instructed William that "[i]f [he] would like to maintain your current coverage, please sign, date, and return the form by 2/27/2013 . . . ." Under the heading "IMPORTANT[,]" the letter also stated, "[i]f we do not receive a new completed Georgia Option Form, we will assume your intent is to select the [UM] Coverage equal to your Bodily Injury and Added On limits. *This will provide you with the broadest [UM] coverage available and will result in an increased premium."*[22] William did not sign and date the option form until March, 6, 2013, *after* the date requested by Liberty Mutual.

---

[21] *See Robinson v. Robinson*, 239 Ga. 323, 324 (1) (236 SE2d 660) (1977) (deeming argument abandoned for purposes of appeal when it was not supported by argument or citation of authority as required by rules).

[22] (Emphasis in original).

14

Irish now argues that—because Liberty Mutual did not receive his selection form by the due date—his policy provided the broadest UM coverage available. But in rejecting this argument, the trial court found that, even if the language referenced by Irish meant that William was provided with (or entitled to) add-on UM coverage between February 27, 2013, and when he ultimately submitted the selection form a week or so late, he effectively modified his policy to provide reduced-by coverage when he did so; and this selection operated as a new agreement and the parties proceeded accordingly.[23] And contrary to Irish's argument, we have held that an insured may modify the terms of his or her insurance policy at any time by notifying the insurer of the requested change.[24] So, regardless of the deadline requested in the

[23] Irish does not dispute that William never paid the increased premium required for add-on UM coverage.

[24] *See Morgan*, 341 Ga. App. at 400 (1) (a) (explaining that the UM statute's default provision regarding UM coverage "applies whenever the insured obtains UM coverage, whether that occurs when the insured first buys the policy *or when the insured requests UM coverage at some later date*—unless the insured affirmatively chooses a lower limit." (emphasis supplied)); *Danforth v. Gov't Emps. Ins. Co.*, 282 Ga. App. 421, 421, 425 (4) (a) (638 SE2d 852) (2006) (holding that an insured successfully modified an insurance policy to remove a vehicle from it by calling the insurance company and requesting the change); *Ramsdell v. State Auto Mut. Ins. Co.*, 206 Ga. App. 357, 358 (1) (425 SE2d 661) (1992) (holding that an insured removed a vehicle and his son, as a driver, from an insurance policy by expressing his intent to do so in a letter he sent to the company); *Progressive Preferred Ins. Co. v. Davis*, 199 Ga. App. 598, 598 (405 SE2d 529) (1991) (holding that insured had made a valid

15

selection form's cover letter, William was permitted to change his UM selection at any time—including after a deadline requested by Liberty Mutual for the 2013 selection form—just as he did on his own in 2009.[25] Indeed, we have held that even "[an] *oral* order for change of coverage [is] in the nature of a binder, and enforceable according to its terms, whatever they were."[26] Thus, even though William signed and returned his form to Liberty Mutual after the deadline requested in the cover letter, his untimely selection of reduced-by UM coverage was nevertheless effective once he made it.[27]

4. Lastly, Irish contends the trial court erred in finding that William "knowingly and voluntarily" selected reduced-by UM coverage. This claim is belied by the record.

---

and enforceable oral request to remove the vehicle involved in the accident from the policy); *Allstate Ins. Co. v. Reynolds*, 138 Ga. App. 582, 584 (2) (227 SE2d 77) (1976) ("The oral order for change of coverage was in the nature of a binder, and enforceable according to its terms, whatever they were.").

[25] *See supra* note 24 & accompanying text.

[26] *Davis*, 199 Ga. App. at 598 (emphasis supplied).

[27] *See supra* note 24 & accompanying text.

As previously noted, both the cover letter and UM option form provided detailed explanations of the differences between add-on and reduced-by coverage. The form then stated, "[b]y my signature below, I acknowledge that I have been offered [UM] Coverage. I understand the explanations, and I selected a limit under [UM] coverage . . . by checking the appropriate box." William also confirmed that his selection would apply to all renewals of the policy "unless [he] indicat[ed] otherwise to Liberty Mutual in writing." Furthermore, parties to a contract are "presumed to have read their provisions and to have understood the contents."[28] Indeed, one who can read, "must read, for he is bound by his contracts."[29] Thus, under the plain and unambiguous language of the UM selection form William signed (as well as the instructions in the accompanying cover letter), his selection of reduced-by coverage was knowing and voluntary.

---

[28] *Wright v. Safari Club Int'l, Inc.*, 322 Ga. App. 486, 493 (4) (745 SE2d 730) (2013) (punctuation omitted); *accord CL SNF, LLC v. Fountain*, 364 Ga. App. 371, 374 (1) (875 SE2d 370) (2022); *see Canales v. Wilson Southland Ins. Agency*, 261 Ga. App. 529, 533 (2) (583 SE2d 203) (2003) ("[A] party to a contract—including an insurance contract—must read the contract . . . .").

[29] *Wright*, 322 Ga. App. at 493 (4) (punctuation omitted); *accord Fountain*, 364 Ga. App. at 374 (1); *Swyters v. Motorola Emps. Credit Union*, 244 Ga. App. 356, 358 (535 SE2d 508) (2000).

For all these reasons, we affirm the trial court's grant of summary judgment to Liberty Mutual.

*Judgment affirmed. Mercier and Markle, JJ., concur.*